460 S.E.2d 436

**STATE of West Virginia ex rel. Brian BILLINGS, Relator,**

v.

**The CITY OF POINT PLEASANT, a Municipal Corporation; Marilyn McDaniel, City Clerk; Russell Holland, Mayor of the City of Point Pleasant, and All Council Members of the City of Point Pleasant, Respondents.**

No. 22837.

Supreme Court of Appeals of West Virginia.

Submitted April 5, 1995.

Decided May 18, 1995.

James M. Casey, Point Pleasant, for relator.

Barry L. Casto, Casto & Casto, Point Pleasant, for respondents.

CLECKLEY, Justice:

In this original mandamus proceeding, the relator challenges the constitutionality of W.Va.Code, 3–5–7(b)(6) (1991), which provides that a candidate for public office must file with a designated clerk a "certificate of announcement" that includes the name of the candidate's political party and a statement verifying that he or she "has not been registered as a voter affiliated with any other political party for a period of sixty days before the day of filing the announcement." The relator, Brian Billings, sought to become a candidate for the office of councilman-at-large in the City of Point Pleasant even though he changed his political party affiliation within sixty days prior to filing his certificate of announcement. The relator asserts the durational party affiliation requirement in W.Va.Code, 3–5–7(b)(6), violates his fundamental right to become a candidate for political office. Due to time constraints imposed by the impending election, we issued our decision in the form of an order on April 7, 1995. We now follow that order with this more detailed opinion.

I.

BACKGROUND

The basic sequence of events does not appear to be in dispute. The respondent, City of Point Pleasant, changed the boundaries of its wards on February 13, 1995, in

order to comply with the one-person/one-vote constitutional requirement. Following the boundary realignment, the Republican and Democratic nominating conventions were conducted March 17, 1995, and March 20, 1995, respectively.

Prior to March, 1995, the relator was a registered Republican. In that month, he changed his affiliation to the Democratic Party and then filed his certificate of announcement to run as a Democrat for the Point Pleasant city council. The relator thus failed to comply with the sixty-day political party affiliation requirement prior to the announcement of his candidacy, as required by W.Va. Code, 3–5–7(b)(6). Michael Shaw, Chairman of the Point Pleasant City Republican Executive Committee, filed a complaint with the respondent, Marilyn McDaniel, City Clerk, seeking to remove the relator from the ballot because of his noncompliance with W.Va. Code, 3–5–7(b)(6).

Although Mr. Shaw's complaint was filed in the City Clerk's office on March 23, 1995, the Democratic chairman's office was not notified of the filing of the complaint until March 30, 1995. Action on the complaint was scheduled for March 31, 1995. In anticipation of the removal of his name from the ballot by the ballot commission, the relator petitioned this Court to issue a rule to show cause directing the respondents to appear and explain why the relator and others similarly situated should not have their names placed on the ballot for the general election on May 20, 1995. The petition challenged the constitutionality of the durational party affiliation requirement in W.Va.Code, 3–5–7(b)(6).

## II.

## DISCUSSION

### A. *Standard for Issuing Writs of Mandamus*

The general standards for issuing a writ of mandamus have been restated many times. The traditional use of mandamus has been to confine an administrative agency or an inferior court to a lawful exercise of its prescribed jurisdiction or "to compel it to exercise its authority when it is its duty to do so." *Roche v. Evaporated Milk Ass'n,* 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185, 1190 (1943); *State ex rel. Frazier v. Meadows,* 193 W.Va. 20, 31, 454 S.E.2d 65, 76 (1994).

Since mandamus is an "extraordinary" remedy, it should be invoked sparingly.[1] In order to ensure that writs of mandamus are restricted to extraordinary situations, we have set forth three conditions that must be met. In Syllabus Point 2 of *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969), we stated:

"A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy."

In other words, the relator here must show a clear and indisputable right to the writ and must have no other means to obtain relief. *See Kerr v. United States District Court,* 426 U.S. 394, 403, 96 S.Ct. 2119, 2124,

---

**1.** It is well established that "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Kerr v. United States District Court,* 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725, 732 (1976). There must be no other adequate means of relief available, and the relator must demonstrate that the right to issuance of the writ is " ' "clear and indisputable." ' " *Kerr,* 426 U.S. at 403, 96 S.Ct. at 2124, 48 L.Ed.2d at 733. (Citations omitted).

W.Va.Code, 3–1–45 (1963), as amended, specifically sanctions writs of mandamus in election disputes. *See Marquis v. Thompson,* 109 W.Va. 504, 155 S.E. 462 (1930) (the remedy is peculiarly applicable in election disputes where speedy settlement is required). Furthermore, this section has been held to apply to municipal elections. *Adams v. Londeree,* 139 W.Va. 748, 83 S.E.2d 127 (1954), *overruled on other grounds, State ex rel. Booth v. Board of Ballot Comm'rs,* 156 W.Va. 657, 196 S.E.2d 299 (1973). Although it is clear this section enlarges the scope of the writ and makes it applicable to all the duties of the election officers, whether ministerial or judicial, we do not interpret W.Va.Code, 3–1–45, as changing the substantive standard for issuing a writ of mandamus. *See generally Marra v. Zink,* 163 W.Va. 400, 256 S.E.2d 581 (1979). Clearly, the first two prerequisites justifying the issuance of a writ of mandamus (discussed *infra* ) are applicable to all mandamus actions.

48 L.Ed.2d 725, 733 (1976). Once these prerequisites are met, this Court's decision whether to issue the writ is largely one of discretion.[2] In considering this petition, we do not believe the relator has shown that he has a clear and indisputable right to the issuance of a writ. For reasons discussed below, we hold the relator has failed to demonstrate that the respondents' decision to disqualify him as a candidate lies outside the bounds of constitutional protection.

## B.  *Analysis*[3]

W.Va.Code, 3–5–7(b)(6), states, in effect, that a candidate cannot qualify to run for public office if he or she changed his or her political party affiliation during the sixty days prior to the announcement of candidacy.[4] In his petition, the relator asserts a writ of mandamus should be granted because the durational party affiliation requirement of W.Va.Code, 3–5–7(b)(6), violates his rights to run for political office and to change parties.[5] The respondents defend the statute's constitutionality and the consequent removal of the relator's name from the ballot on the ground that the law serves the compelling state interest in orderly election proceedings by preventing "party-shopping" by candidates.[6] According to the respondents, party-shop-

---

**2.** Mandamus may be especially appropriate to further supervisory and instructional goals, especially where important issues are unsettled.

**3.** The sole issue presented to this Court is the constitutionality of W.Va.Code, 3–5–7(b)(6). In the absence of any contention to the contrary, we assume for purposes of this opinion that this subsection is applicable to municipal elections in the City of Point Pleasant. We note that W.Va. Code, 3–1–2 (1971), states the provisions of Chapter 3 "shall be construed to be operative in municipal elections only in those instances in which they are made expressly so applicable." W.Va.Code, 3–5–7(b)(6), is silent as to its applicability to municipal elections. However, W.Va. Code, 8–5–6 (1969), explicitly makes "the general law with respect to the method and time for the filing of certificates of candidacy, nominating candidates, conducting primary and regular municipal elections" applicable to municipal elections "[e]xcept as otherwise provided in the charter of any municipality[.]" Furthermore, both W.Va.Code, 8–5–7(c) (1969), and W.Va.Code, 8–5–11 (1969), provide that the qualifications of a municipal candidate may be determined by the municipality's charter or ordinances. Neither party has provided this Court with evidence demonstrating any inconsistency between W.Va. Code, 3–5–7(b)(6), and the City of Point Pleasant's charter or ordinances.

**4.** W.Va.Code, 3–5–7, reads, in part:
"(b) The certificate of announcement shall be in a form prescribed by the secretary of state on which the candidate shall make a sworn statement before a notary public or other officer authorized to give oaths, containing the following information:
*  *  *  *  *  *
"(6) For partisan election, the name of the candidate's political party, and a statement that the candidate is a member of and affiliated with that political party as is evidenced by the candidate's current registration as a voter affiliated with that party, and that the candidate has not been registered as a voter affiliated with any other political party for a period of sixty days before the day of filing the announcement[.]"

**5.** The relator also asserts the statute is unconstitutional because it creates, without a compelling state purpose, three classes of candidates: (1) candidates who have been members of their political party for more than sixty days prior to filing, (2) candidates who were members of a different political party less than sixty days before filing, and (3) candidates who have not been members of any political party within the sixty-day period. Assuming that to be a fair breakdown of the statute (which is questionable), any equal protection argument that relator's class (the second one above) is the subject of unconstitutional discrimination ultimately boils down to the same considerations and analyses as is applied to his fundamental right of candidacy argument dealt with in the text. If W.Va.Code, 3–5–7(b)(6), were applied to discriminate against independents (the third class above), then additional constitutional concerns would be presented. *See, e.g., Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *State ex rel. Chambers v. Beermann,* 229 Neb. 696, 428 N.W.2d 883 (1988); *Independent American Party v. Lau,* 110 Nev. 1151, 880 P.2d 1391 (1994). The relator, however, lacks standing to present those concerns, and we do not address them here.

**6.** The West Virginia Legislature's power to regulate the nomination and election of candidates and to prescribe qualifications for public office is plenary "except to the extent that it is limited by the provisions of the Constitution of this State or of the Constitution of the United States." *Evans v. Charles,* 133 W.Va. 463, 468, 56 S.E.2d 880, 882 (1949). *See also Adkins v. Smith,* 185 W.Va. 481, 408 S.E.2d 60 (1991); *Marra v. Zink,* 163 W.Va. 400, 256 S.E.2d 581 (1979).

ping threatens to "confuse and baffle" and, perhaps, even defraud the voters of the City of Point Pleasant.

We agree with the relator that the West Virginia Constitution confers a fundamental right to run for public office. This right necessarily follows from several provisions. First, Article IV guarantees a right of political participation through Section 1's extension of the franchise to all adults (except those of unsound mind or under a felony conviction) and through Section 4's use of the Section 1 voter eligibility criteria to determine eligibility for public office. We, accordingly, concluded in *Marra v. Zink*, 163 W.Va. 400, 403, 256 S.E.2d 581, 584 (1979), that "art. 4, § 4 is the exclusive constitutional authority for the establishment of qualifications for municipal office and any qualifications in excess of the provision cannot be created by general law under authority of *W.Va.Const.*, art. 4, § 8 nor under the Legislature's plenary law making power." In context, this limitation means the Legislature cannot go beyond the criteria in Section 4 of Article IV unless it can satisfy a compelling state interest analysis. *Sturm v. Henderson,* 176 W.Va. 319, 342 S.E.2d 287 (1986), *superseded by constitutional amendment as stated in Adkins v. Smith,* 185 W.Va. 481, 408 S.E.2d 60 (1991).

Second, a citizen's decision to run for office necessarily involves him or her in expression that lies at the very core of free speech protected by Section 7 of Article III, that is, in political speech aimed at influencing voters and shaping governmental policy. *See Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Garcelon v. Rutledge,* 173 W.Va. 572, 318 S.E.2d 622 (1984). Even candidates who lose often make valuable contributions to the political process by introducing new ideas, exposing shortcomings in government, providing an outlet for intense feelings held by certain constituencies, highlighting previously understated issues, or pushing the other candidates one way or another on the political spectrum.

Third, candidates' rights are necessarily tied to voters' rights. Clearly, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on the right strike at the heart of representative democracy." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506, 523 (1964). A citizen's right to vote is not worth much if the law denies his or her candidate of choice the opportunity to run. "The rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlating effect on voters." *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92, 99 (1972). As the United States Supreme Court observed in *Powell v. McCormack,* 395 U.S. 486, 548, 89 S.Ct. 1944, 1977, 23 L.Ed.2d 491, 531 (1969):

"A fundamental principle of our representative democracy is, in Hamilton's words, 'that the people should choose whom they please to govern them.' 2 *Elliot's Debates,* 257. As Madison pointed out at the convention, this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself."

Finally, candidacy rights necessarily implicate the freedom of association protected by Section 16 of Article III ("[t]he right of the people ... to consult for the common good ... shall be held inviolate"). Political candidacies are essentially a coming together of voters to support a particular platform, cause, or leader. Political parties, which are—for better or worse—an integral part of our democratic system, measure their success through their candidates. By limiting access to the ballot, the State necessarily constricts the opportunities of political associations not only to prevail in the electoral process, but also to participate meaningfully in it. *See, e.g., Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Garcelon v. Rutledge, supra.*

When reviewing the constitutionality of our election laws that burden the right to vote and the right to run for public office, we must weigh "the character and magnitude of the asserted injury to the rights protected by the ... [Constitution] that the ... [relator] seeks to vindicate" against "the precise interests put forward by the State as justifications

for the burden imposed by its rule," taking into consideration not only "the legitimacy and strength of each of those interests," but also "the extent to which those interests make it necessary to burden the ... [relator's] right." *Anderson v. Celebrezze,* 460 U.S. at 789, 103 S.Ct. at 1570, 75 L.Ed.2d at 558. This balancing test was further clarified in *Burdick v. Takushi,* 504 U.S. 428, 432–36, 112 S.Ct. 2059, 2063–64, 119 L.Ed.2d 245, 253–54 (1992):

> "[U]nder this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' ... But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." (Citation omitted).

Thus, we have consistently adhered to the conclusion stated in Syllabus Point 1, in part, of *State ex rel. Piccirillo v. City of Follansbee,* 160 W.Va. 329, 233 S.E.2d 419 (1977): "The right to become a candidate for the office of city council is a fundamental right ..., and the State, in order to restrict this right, must demonstrate that a compelling state interest is served by such restriction." *See also Smith v. County Comm'n of McDowell County,* 184 W.Va. 328, 400 S.E.2d 572 (1990); *Sturm v. Henderson, supra; Garcelon v. Rutledge, supra; State ex rel. Bromelow v. Daniel,* 163 W.Va. 532, 258 S.E.2d 119 (1979); *Marra v. Zink, supra.*

■ Without doubt, W.Va.Code, 3–5–7(b)(6), restricts the rights of individuals to participate as candidates in partisan elections. In effect, it prohibits individuals from running for office for a period of sixty days after they change their political party affiliation. Thus, the respondents will not be allowed to invoke that provision to remove the relator's name from the ballot unless they can demonstrate that the temporary ban is necessary to accomplish a compelling state interest.[7]

Although we have never decided an issue relating to durational political party affiliation requirements, we have addressed the constitutionality of durational residency requirements as applied to political candidates. In *Marra v. Zink, supra,* we held a city charter's one-year durational residency requirement for eligibility to a city council seat violated the West Virginia Constitution because the city was unable to show a compelling governmental purpose warranted the restriction. We were unable to see how "a one year period of continuous residency ... [would be] necessary to make ... [a candidate] more familiar with ... [a] city[.]" 163 W.Va. at 406, 256 S.E.2d at 585. In addition, we were concerned that such local requirements would not only exclude qualified candidates, but also would exclude candidates living in areas annexed by a city.

On the other hand, in *White v. Manchin,* 173 W.Va. 526, 318 S.E.2d 470 (1984), we upheld a one-year residency requirement for a state office against a federal equal protection challenge.[8] Noting that a majority of jurisdictions have upheld such requirements when imposed at the state level, we recognized the requirements promoted three state

**7.** As noted above, the relator also contends he has a right to change parties, which is hampered by W.Va.Code, 3–5–7(b)(6). We agree. As the United States Supreme Court has recognized, restrictions that limit an individual's ability to select and change his or her political party affiliation clearly implicate the speech and associational freedoms guaranteed by the First Amendment. *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973). But recognition of that right and of the burden placed on it by W.Va.Code, 3–5–7(b)(6), only entitles the relator to invoke the compelling state interest test. Because the relator's fundamental right to candidacy also requires use of that standard, and because we apply the standard *infra,* the relator's right to change political parties does not enhance his case.

**8.** In *White,* no argument could have been made under the West Virginia Constitution because the requirement at issue—that State senators must reside in their districts for at least one year prior to their election—was imposed by Section 12 of Article VI of the West Virginia Constitution.

interests that, collectively or separately, reached the compelling level: (1) "candidate familiarity with the needs and problems of the people to be represented"; (2) "voter familiarity with the character, intelligence, and reputation of the candidates"; and (3) "precluding frivolous or fraudulent candidacies by those who are more interested in public office than in public service." 173 W.Va. at 545, 318 S.E.2d at 489. *Marra* is distinguishable from *White* because we found in *White* that the complexity of state-level politics provided a greater justification for durational residency requirements than could be found at a local level. 173 W.Va. at 545, 318 S.E.2d at 489. In addition, the State's interest in thwarting political carpetbaggers is considerably greater regarding such offices as the State Legislature (as in *White*) than it is in the case of municipal offices (as in *Marra*).

Although *Marra* and *White* reached opposite conclusions about the constitutionality of the particular durational residency requirements they addressed, we believe their analyses and results were consistent. Those cases instruct us that the application of the compelling state interest standard requires a searching examination of the State's rationales for any restriction on the right to candidacy. Additionally, the selection of the compelling state interest analysis is not the end result. Application of the analysis in the context of the electoral process must recognize that the Legislature, as well as the judiciary,[9] has a role to play in ensuring the process retains its integrity and functions as an accurate reflection of the people's will. The analysis often requires courts to make some delicate distinctions, but that is perhaps an unavoidable effect of dealing with sensitive rights set in a highly regulated context.

Turning specifically to the constitutionality of durational affiliation laws, we note a significant majority of courts considering them have upheld the laws on the basis they promote political stability, preserve party integrity by discouraging party-raiding, and prevent voter confusion. *See, e.g., American Party of Texas v. White*, 415 U.S. 767, 94

S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Crowells v. Petersen*, 118 So.2d 539 (Fla.1960); *State ex rel. Thatcher v. Brodigan*, 37 Nev. 458, 142 P. 520 (1914).

The interest of the State "in the stability of its political system" is "not only permissible, but compelling[.]" *Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714, 727 (1974). In *Storer*, the United States Supreme Court upheld a California statute requiring independent candidates to be disaffiliated with a "qualified political party" for one year preceding any primary election. The Supreme Court sustained the statute because it furthered the important state interests in maintaining the integrity of the electoral process and preventing factionalism. "As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." 415 U.S. at 730, 94 S.Ct. at 1279, 39 L.Ed.2d at 723. Because the durational affiliation requirement promoted—rather than detracted from—the purity and fairness of the democratic process, there was no need for judicial intervention and invalidation of the law.

Similarly, state courts have upheld the constitutionality of a requirement that candidates be affiliated with a political party for a certain period prior to seeking nomination or election. In *Ray v. Mickelson*, 196 Colo. 325, 327, 584 P.2d 1215, 1217 (1978), for example, the Supreme Court of Colorado affirmed an order declaring ineligible a candidate who failed to meet the statutory requirement that he must have been a member of the political party he sought to represent for at least twelve months prior to his nomination. A Florida appellate court in *Polly v. Navarro*, 457 So.2d 1140, 1143 (Fla.App.1984), adopted the *Storer* analysis and rejected a constitutional challenge to a statute that disqualified any person who had been a candidate for nomination for a different political party within the six months preceding the general election. The *Polly* court concluded the law clearly served "the governmental interests of maintaining the integrity of different routes to the ballot and of stabilizing the political

---

**9.** *See generally* John H. Ely, Democracy and Distrust (1980).

system[.]" 457 So.2d at 1143. *See also Davis v. State Election Bd.*, 762 P.2d 932 (Okla.1988) (upholding six-month disaffiliation requirement for independent candidates); *State ex rel. Graham v. Board of Elections*, 60 Ohio St.2d 123, 14 O.O.3d 349, 397 N.E.2d 1204 (1979) (applying statutory prohibition against candidacy where candidate voted as member of different political party within the preceding four calendar years).[10]

As noted above, the prevention of "party-raiding" is also frequently cited as a compelling justification for party affiliation statutes. For example, in *Lippitt v. Cipollone*, 337 F.Supp. 1405, 1406 (N.D.Ohio 1971), *aff'd mem.*, 404 U.S. 1032, 92 S.Ct. 729, 30 L.Ed.2d 725 (1972), the district court upheld a statute that permitted the disqualification of candidates who voted as members of different political parties at any primary election in the preceding four calendar years. *Lippitt* explained:

"The compelling State interest the Ohio Legislature seeks to protect . . . is the integrity of all political parties and membership therein. These Ohio statutes seek to prevent 'raiding' of one party by members of another party and to preclude candidates from '. . . altering their political party affiliations for opportunistic reasons.' *State ex rel. Bible v. Board of Elections*, 22 Ohio St.2d 57, [51 O.O.2d 92,] 258 N.E.2d 227 (1970)."

*See also Bendinger v. Ogilvie*, 335 F.Supp. 572, 575 (N.D.Ill.1971) (upholding a two-year disaffiliation requirement out of fear that "party swapping and changing might become so prevalent that the average political party could no longer function properly").

In light of the consistent results reached by the above authorities, from the United States Supreme Court as well as state and lower federal courts, we conclude the State's interests in preserving the integrity of the political process and in preventing party raiding and voter confusion rise to the compelling level. Furthermore, we find those interests are put at risk by candidates who skip from one party to another just prior to an election campaign to take advantage of a political opportunity. Our analysis does not end there, however. We will still not uphold W.Va.Code, 3–5–7(b)(6), if there is a less restrictive means of satisfying legitimate state goals. As indicated by the United States Supreme Court in numerous cases: "If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes*, 414 U.S. 51, 59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260, 268 (1973). *See also Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960). Therefore, unduly restrictive election laws, even if based on compelling governmental purposes, are unconstitutional.[11]

In the present case, the relator has not suggested nor have we found a less restrictive method for the State to address the problems caused by candidate party-switching and to satisfy its legitimate goals of protecting the election process and maintaining party integrity. The sixty-day party affiliation requirement, short in comparison to those upheld in other cases, focuses precisely on that political opportunism which is most likely to threaten the State's interests [12]—

---

**10.** We approvingly cite these cases only to the extent they recognize that durational affiliation requirements promote compelling state interests. In doing so, we imply no endorsement of the constitutionality of the length of the particular durational periods at issue in the cases.

**11.** "If there are other reasonable ways to achieve [the state's] goals with a lesser burden on the constitutionally protected activity, the state may not choose the way of greater interference. If it acts at all, it may not choose a legislative scheme that broadly stifles the exercise of fundamental liberties." *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 284–85 (1972).

**12.** Courts that have invalidated durational affiliation requirements have done so only because the statute either discriminated against independent candidates, *McCarthy v. Austin*, 423 F.Supp. 990 (W.D.Mich.1976), or imposed an unduly severe restriction. *Kay v. Brown*, 424 F.Supp. 588 (D.C.Ohio 1976) (four-year disqualification was unnecessarily burdensome and therefore unconstitutional). *See also Ray v. State Election Bd.*, 422 N.E.2d 714 (Ind.App.1981).

Although courts are reluctant to draw lines of unconstitutionality across classifications that run along a continuum, *see, e.g., United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 182–98, 101 S.Ct. 453, 463–71, 66 L.Ed.2d 368, 381–90 (1980) (Brennan, J., dissenting), such line

*i.e.,* on party switches that occur just before an election campaign when the candidacy openings suddenly appear and the public's ability to assess changes in affiliation is reduced by time constraints and other election news. Moreover, none of the reasons advanced in the relator's petition justify his failure to change his party affiliation in time to allow him to run as a Democrat.[13] Finally, the relator can run for office in any future election in the State, so long as he either runs as a Democrat or changes his political party before the sixty days preceding his candidacy announcement.

## III.

### CONCLUSION

For the foregoing reasons, we hold that W.Va.Code, 3–5–7(b)(6), is valid under both the United States Constitution and the West Virginia Constitution. Accordingly, the writ of mandamus is denied.

Writ denied.

BROTHERTON, J., did not participate.

FOX, J., sitting by temporary assignment.

drawing is often unavoidable in election cases. *E.g., compare Dunn v. Blumstein, supra* (one-year durational residency requirement was unconstitutional as a penalty on the right to travel and a deprivation of the right to vote), *with Marston v. Lewis,* 410 U.S. 679, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1973) (fifty-day closing period for voter registration prior to an election was necessary for administrative purposes and was, therefore, constitutional even though it barred newly arrived residents from voting); *compare Williams v. Rhodes, supra* (ballot access requirement that third party candidates submit petitions with signatures of registered voters totaling 15 percent of the number of votes cast in preceding election was unconstitutional), *with Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (requiring third party candidates seeking to qualify for the ballot to submit petitions with signatures totaling 5 percent of those eligible to vote in the last election was constitutional).

In this case, we need only decide whether the sixty-day period in W.Va.Code, 3–5–7(b)(6), is on the valid side of the line of constitutionality that crosses the spectrum of durational affiliation requirements. We believe the Legislature properly focused on the most critical period of time, and the sixty-day requirement is necessary to protect the State's interests. Thus, we are not called upon here to determine precisely where on the spectrum the line of constitutionality must be drawn. Of course, the longer the durational disqualification extends the more difficulty the State has in demonstrating its necessity.

13. The relator asserts the City of Point Pleasant reorganized its wards pursuant to a city ordinance in February, 1995. As a result, the Republican and Democratic nomination conventions were not held until March 17 and 20, 1995, respectively. The relator does not explain what relevance these events had on his untimely change in affiliation or how they diminish the State's interests in preventing political chicanery that threatens the integrity of the electoral process.