No. 16-0013 –  *State of West Virginia ex rel. Belinda Biafore, Chair of the West Virginia State Democratic Committee; and Stephen Davis, Linda Klopp, David Thompson, Linda Phillips, Stephen Evans, and Patricia Blevins, Members of the West Virginia Democratic Executive Committee for the Ninth Senatorial District v. Earl Ray Tomblin, Governor of the State of West Virginia; and Beverly R. Lund, Justin M. Arvon, Sue "Naomi" Cline, Tony Paynter, John Doe, and Jane Doe, Members of the West Virginia Republican Executive Committee for the Ninth Senatorial District, and State of West Virginia, by its Attorney General Patrick Morrisey*

Davis, Justice, dissenting:

As observed by the majority, the Court's decision in this case "is grounded in law, not in ideology or politics." I could not agree more with this sentiment, but I strongly disagree with how the law was applied in the Court's decision of this case because the majority has let the exception to statutory construction swallow the rule. Like proverbial deer in the headlights, the parties to the instant proceeding have virtually frozen when faced with the full measure of the legal question presented by this case: the proper construction and application of W. Va. Code § 3-10-5 (2013) (Repl. Vol. 2013). While it was considerate for the parties to evade the pivotal question of this statute's constitutionality to facilitate the Court's decision of this case, such niceties were neither necessary nor prudent. This Court regularly considers and decides issues involving this State's Constitution, and, while addressing the constitutionality of a statutory provision is not always a routine part of this

1

Court's statutory construction, sometimes the constitutional implications of a statute's construction require venturing into that realm. Discerning the meaning and application of W. Va. Code § 3-10-5 requires such a constitutional analysis. Though, on its face, the statutory language appears innocuous, a closer examination of the statute's wording in light of the Legislature's intent in promulgating this provision demonstrates that W. Va. Code § 3-10-5 cannot constitutionally be applied as it is written because the express language is internally inconsistent, contravenes the underlying legislative intent, and violates the West Virginia Constitution. Because the majority of this Court has insisted on following the lead of the parties and skirted around both the recognition and the resolution of this pivotal constitutional issue, I resolutely dissent.

### Propriety of Addressing Statute's Constitutionality

When this Court encounters a matter of statutory construction, it is customary to adopt an interpretation that is consistent with the commands of this State's Constitution. *See* Syl. pt. 5, *Community Antenna Serv., Inc. v. Charter Commc'ns VI, LLC*, 227 W. Va. 595, 712 S.E.2d 504 (2011) ("'A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the

effectuation of the general purpose and design thereof, if its terms are consistent therewith.' Syl. Pt. 5, *State v. Snyder,* 64 W. Va. 659, 63 S.E. 385 (1908)."). In this regard, the Court has determined that "'whenever an act of the legislature can be so construed and applied as to avoid a conflict with the constitution, and give it the force of law, such construction will be adopted by the court.'" *Morris v. Crown Equip. Corp.*, 219 W. Va. 347, 355, 633 S.E.2d 292, 300 (2006) (quoting *Peel Splint Coal Co. v. State*, 36 W. Va. 802, 815, 15 S.E. 1000, 1004 (1892) (citation omitted)). *See also* Syl. pt. 29, *Coal & Coke Ry. Co. v. Conley*, 67 W. Va. 129, 67 S.E. 613 (1910) ("Courts will never impute to the legislature intent to contravene the constitution of either the state or the United States, by construing a statute so as to make it unconstitutional, if such construction can be avoided, consistently with law, in giving effect to the statute, and this can always be done, if the purpose of the act is not beyond legislative power in whole or in part, and there is no language in it expressive of specific intent to violate the organic law.").

Nevertheless, while statutory construction generally counsels against constitutionality inquiries, such an analysis may, and simply must, be performed when confronted with a statute that clearly violates the express language of the Constitution of this State. Thus, where, as here, the constitutional question has been raised by the parties,[1] it is

---

[1]While not artfully addressed or thoroughly briefed, the issue of the constitutionality of the subject statute was undeniably raised and interjected into the parties'
(continued...)

certainly permissible to undertake such an analysis when necessary to thoroughly ascertain the meaning of the subject statute and, more particularly, where other constructions of the same statute would lead to unjust, absurd, inconsistent, or *unconstitutional* results. When conducting such a constitutional inquiry, this Court is guided by its holding in Syllabus point 1 of *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965):

> In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

Despite this countenance, a statute may be invalidated as unconstitutional when it infringes a right specifically guaranteed by this State's Constitution.

> It is no objection to the remedy in [a] case, that the statute, the application of which in the particular case is sought to be prevented, is not void on its face, but is complained of only because its operation in the particular instance works a violation of a constitutional right.

Syl. pt. 8, *Conley*, 67 W. Va. 129, 67 S.E. 613. *Accord* Syl. pt. 12, *Farley v. Graney,* 146

---

[1](...continued)
arguments regarding the proper construction of W. Va. Code § 3-10-5.

W. Va. 22, 119 S.E.2d 833 (1960) ("An act of the legislature may be valid in its general scope and broad outline but invalid to the extent that the restrictions imposed thereby are clearly arbitrary and unreasonable in their application to specific property."); *Harbert v. Harrison Cnty. Court,* 129 W. Va. 54, 69, 39 S.E.2d 177, 188 (1946) ("A statute, however, may be unconstitutional and void in its application to a part of its subject matter and valid as to the remainder. It may be constitutional in operation with respect to one state of facts and unconstitutional as to another." (citation omitted)).  It is pursuant to this standard that the Court should have decided the case *sub judice*.

### *West Virginia Code § 3-10-5 Violates West Virginia Constitution Article II, Section 2*

While I agree with the majority's facial interpretation of the express language of W. Va. Code § 3-10-5, I disagree that that limited analysis concludes the Court's inquiry. This Court repeatedly has stated that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature."  Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975).  Moreover, "[i]n ascertaining legislative intent, effect must be given to *each part of the statute and to the statute as a whole* so as to accomplish the general purpose of the legislation."  Syl. pt. 2, *id* (emphasis added).  However, when determining the Legislature's intent in promulgating a particular provision, no single statute can be viewed in isolation; rather, the tenor of *all* of the statutes that comprise a given body of law are instructive to ascertaining the legislative

5

intent inherent within a statute. In other words, "[s]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syl. pt. 3, *id.* Thus,

> [s]tatutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent. Accordingly, a court should not limit its consideration to any single part, provision, section, sentence, phrase or word, but rather review the act or statute in its entirety to ascertain legislative intent properly.

Syl. pt. 5, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W. Va. 14, 217 S.E.2d 907 (1975).

The Legislature enacted W. Va. Code § 3-10-5 as part of the voluminous chapter of laws governing elections in this State. *See* W. Va. Code § 3-1-1 (1963) (Repl. Vol. 2013) ("This chapter shall constitute and may be cited as the 'West Virginia Elections Code' and contemplates and comprehends a code of laws for the establishment, administration and regulation of elections and election procedures in the state of West Virginia."). As a legislative enactment, it is to be presumed that this section complies with the mandates of the West Virginia Constitution, and, in particular, article II, section 2 which provides that "[t]he powers of government reside in all the citizens of the State, and can be rightfully exercised only in accordance with their will and appointment." By its express terms, this constitutional command secures the mandate of the electorate in their choice of

6

the people who will represent them and their interests in this State's government. "A constitution is the fundamental law by which all people of the state are governed. It is the very genesis of government. Unlike ordinary legislation, a constitution is enacted by the people themselves in their sovereign capacity and is therefore the paramount law." *State ex rel. Smith v. Gore*, 150 W. Va. 71, 77, 143 S.E.2d 791, 795 (1965). Thus, it is not for this Court to decide whether it will heed this clear constitutional command. Rather, enforcement of rights secured by the Constitution of this great State is engrained in this Court's inherent duty to neutrally and impartially interpret and apply the law. In other words, "[c]ourts are not concerned with the wisdom or expediencies of constitutional provisions, and the duty of the judiciary is merely to carry out the provisions of the plain language stated in the constitution." Syl. pt. 3, *State ex rel. Casey v. Pauley*, 158 W. Va. 298, 210 S.E.2d 649 (1975). This is so because "[t]he provisions of the Constitution, the organic and fundamental law of the land, stand upon a higher plane than statutes, and they will as a rule be held mandatory in prescribing the exact and exclusive methods of performing the acts permitted or required." Syl. pt. 2, *Simms v. Sawyers*, 85 W. Va. 245, 101 S.E. 467 (1919).

It is apparent from reading the various statutes enacted by the Legislature in its definition of this State's election laws that it recognized and heeded the constitutional command announced by article II, section 2. Replete in this body of law are numerous provisions that safeguard a voter's choice of candidate and ensure that his/her vote will be

7

recorded as it was cast. *See, e.g.*, W. Va. Code § 3-1-45 (2003) (Repl. Vol. 2013) (authorizing mandamus proceeding to compel performance of duties required under State's election laws); W. Va. Code § 3-1A-1 (2010) (Repl. Vol. 2013) (forming State Election Commission); W. Va. Code § 3-5-19 (2007) (Repl. Vol. 2013) (defining procedure for filling vacancy in nomination); W. Va. Code § 3-9-9 (1986) (Repl. Vol. 2013) (ensuring secrecy of voter's ballot); W. Va. Code § 3-9-17 (1963) (Repl. Vol. 2013) (imposing criminal penalties for alteration of voter's ballot). *See also* W. Va. Code § 3-3-1 *et seq.* (delineating procedures for absentee voting and handling of such ballots); W. Va. Code § 3-3A-1 *et seq.* (establishing pilot program for voting by mail and process to govern collection and counting of ballots cast in this manner); W. Va. Code § 3-3B-1 *et seq.* (forming uniformed services and overseas voter pilot program and defining procedure for tabulating such ballots). Still other statutes ensure the integrity of the election process, itself, by requiring candidates for office to pledge to conduct their campaigns in such a manner so as to uphold "the full and free expression of the will of the voters" and to defend "the right of every qualified voter to full and equal participation in the electoral process." W. Va. Code § 3-1B-5 (1995) (Repl. Vol. 2013). *See also* W. Va. Code § 3-5-7(d)(6)(B) (2015) (Supp. 2015) (requiring candidate to maintain allegiance to his/her stated political party for specified period by verifying that he/she has been member of same political party for sixty days preceding filing of his/her "certificate of announcement"). And, included within this body of election law is, of course, the nefarious § 3-10-5 which stands at the center of the instant controversy.

I agree with my colleagues that, on its face, this seemingly innocuous provision provides the guidance sought by the parties. However, a closer reading of this statute inevitably reveals internal inconsistencies that I submit render it unconstitutional because it cannot, as it is written, carry out the will of the voters. In subsection *a* of W. Va. Code § 3-10-5, the Legislature references "the party with which the person holding the office immediately preceding the vacancy was affiliated," which the majority correctly interprets as referring to the party that the outgoing legislator belonged to at the time he/she vacated his/her office. However, subsection *c* of this same code section requires "the party executive committee of the state senatorial district in which the vacating senator resided *at the time of his or her election or appointment*" to supply the Governor with the list of names from which a replacement senator is to be appointed. (Emphasis added). These incongruous directives simply do not make sense if the Legislature, as is this Court, is duty-bound to abide by the will of the voters *vis-à-vis* their choice of elected officials.

I understand subsection *c* to refer to the party executive committee of the state senatorial district from which the outgoing senator was *elected* so as to ensure that the representational balance of the Senate is maintained even if the senatorial districts might be reconfigured, as has happened in this case between the time of Senator Hall's election and his resignation. Such balance can be achieved only by maintaining the *status quo* sanctioned by the voters, *i.e.*, ensuring both the same geographical area and the same political party that

9

elected the vacating senator are responsible for nominating his/her replacement. Recognizing and safeguarding the will of the voters in this manner "serv[es] to protect the mandate of the preceding election[,] . . . preserve[s] the 'legislative balance' until the next general election is held[, and] . . . make[s] provision for continuity of party representation." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 13, 102 S. Ct. 2194, 2201-02, 72 L. Ed. 2d 628 (1982) (citation and footnote omitted). If the Legislature recognizes that it must uphold the voters' right to select their representatives so as to require the replacement senator be chosen from the *same senatorial district as it existed at the time of the election*, it seems, too, that the only way to be certain that the voters' prerogative, *as it existed at the time of the election*, is realized is to also require that the replacement senator be chosen from the *same political party* as that from which the vacating senator served as candidate when he/she was elected to office. Indeed, "'party selection is more likely to reflect the will of the voters . . . for it was the former representative's party . . . that won the prior seat.'" *Rodriguez*, 457 U.S. at 12 n.12, 102 S. Ct. at 2201 n.12, 72 L. Ed. 2d 628 (quoting *Garcia v. Barcelo*, 671 F.2d 1, 6 (1st Cir. 1982)).

To interpret W. Va. Code § 3-10-5 in this manner, though, makes it internally inconsistent, as subsection *a* prefers the vacating senator's party affiliation at the time he/she leaves office, while subsection *c*, to comply with the constitutional mandate of the voters secured by article II, section 2, requires the vacating senator's party at the time he/she was

10

elected to nominate his/her replacement. In light of this incongruous and inconsistent result, W. Va. Code § 3-10-5 must be deemed unconstitutional. *See* Syl. pt. 6, *City of Fairmont v. Pitrolo Pontiac-Cadillac Co.*, 172 W. Va. 505, 308 S.E.2d 527 (1983) ("Generally, when a statute or ordinance is declared unconstitutional, it is inoperative, as if it had never been passed.").

This reading of the statute is even more compelling when viewed in the context of the instant controversy. While it goes without saying that the party-changing scenario presented by the case *sub judice* was not definitively addressed by the subject statute, and perhaps was never even contemplated when it was enacted or amended, that, nevertheless, is the fact pattern to which § 3-10-5 must be interpreted to apply in this case. Although the respondents make much of the changing nature of the election results in recent contests as indicating a change in party support by the voters, that trend simply is not relevant to the instant inquiry. Neither voter demographics nor the political party affiliation of candidates elected in 2014 is instructive to a determination of the will of the voters who elected Senator Hall, as a Democrat, in 2012. It is Senator Hall who has vacated his seat, and who must be replaced by the Governor, not a subsequently elected or differently affiliated candidate. Moreover, it must be remembered that substantial legislative redistricting took place following the 2010 Census, the effects of which were not felt until the 2014 election at which time the *same* Ninth Senatorial District may have represented *different* voters in the 2014

11

election than it did in the 2012 election. Thus, allegiance to the will of the voters who elected Senator Hall as a Senator from the Ninth District in 2012 requires that a replacement candidate from *both* the *same* geographic area *and* the *same* political party as that represented by then-candidate Hall during the 2012 election be appointed. As noted previously, the *only* way the mandate of the Ninth District's 2012 electorate, as secured by article II, section 2 of the West Virginia Constitution, can be faithfully upheld within the current factual context is to declare W. Va. Code § 3-10-5 to be unconstitutional.

### *West Virginia Code § 3-10-5 Violates West Virginia Constitution Article II, Section 4*

I also find W. Va. Code § 3-10-5 to be unconstitutional under article II, section 4 of this State's Constitution because this code provision operates to disenfranchise the voters of the political party for whom the vacating legislator served as a candidate when, as here, that legislator subsequently changes political parties and, upon his/her departure from office, is replaced by a person from the legislator's new political party. Article II, section 4 states that "[e]very citizen shall be entitled to equal representation in the government, and, in all apportionments of representation, equality of numbers of those entitled thereto, shall as far as practicable, be preserved." This Court previously has determined this language to be plain: "[w]e believe that Article II, Section 4 of our Constitution is clear in its terms and that the intention thereof is manifest from the language used. It provides for equal representation in government and, additionally, in all apportionments of representation."

12

*State ex rel. Smith v. Gore*, 150 W. Va. at 76, 143 S.E.2d at 794.  Thus, it is clear that the voters of this State have the right, guaranteed by this State's Constitution, to elect the individuals who will represent them, and their interests, in this State's Legislature.

Moreover, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 535, 11 L. Ed. 2d 481 (1964).  As this Court previously has recognized,

> the 'one person, one vote' principle is now firmly established in broad general terms without qualification or exception. *Certainly the right of the voter to equal protection, the right to protection against the dilution or debasement of the weight or force of an individual's vote, is fully as sound, sacred and important* when he is voting on issues involving taxation, public revenue and the promotion of an adequate public school system, as *when he is voting for the* nomination or *election of* a constable, *a state senator*, a governor or any other public official *to represent the voter in government*.
>
> The fact remains that our state constitution has extended the right of the voter into these areas; and when the voter was constitutionally granted the right to vote on these important issues, he thereby became guaranteed the equal protection of the law under the Fourteenth Amendment and the constitutional right to have his vote accorded the same weight, effect and force as that of any other persons's vote, and thereby he became protected by the constitutional right to have the weight, force and effect of his vote not debased or diluted when considered in relation to the vote of any other person.

*Lance v. Board of Educ. of Cnty. of Roane*, 153 W. Va. 559, 572-73, 170 S.E.2d 783, 790-91

(1969) (emphasis added), *rev'd on other grounds sub nom.*, *Gordon v. Lance*, 403 U.S. 1, 91 S. Ct. 1889, 29 L. Ed. 2d 273 (1971).

I would be remiss if I did not acknowledge that persons who are elected to political office also have a constitutionally protected right: the right to join the political party of their choosing. Syl. pt. 3, *State ex rel. Billings v. City of Point Pleasant*, 194 W. Va. 301, 460 S.E.2d 436 (1995) ("Restrictions that limit an individual's ability to select and change his or her party affiliation implicate the speech and associational freedoms guaranteed by the First Amendment to the United States Constitution and by Sections 7 and 16 of Article III of the West Virginia Constitution. Such restrictions cannot be imposed on these rights unless the restrictions are necessary to accomplish a legitimate and compelling governmental interest and there is no less restrictive means of satisfying such interest."). That is not to say, however, that the whim of the one may trump the will of the many. While the express language of W. Va. Code § 3-10-5 may require replacing a vacating legislator with an individual of the last political party of which the vacating legislator was a member, where, as here, that legislator has changed parties such that the person replacing him/her is a member of a different political party than the one that sponsored the legislator as a candidate for political office at the time he/she was elected, such a replacement procedure effectively frustrates the voters' right to elect the candidate of their choice. "Political candidacies are essentially a coming together of voters to support a particular platform, cause, or leader.

14

Political parties, which are—for better or worse—an integral part of our democratic system, measure their success through their candidates." *Billings*, 194 W. Va. at 305, 460 S.E.2d at 440. Therefore, it is inevitable that

> candidates' rights are necessarily tied to voters' rights. Clearly, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on the right strike at the heart of representative democracy." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S. Ct. 1362, 1378, 12 L. Ed. 2d 506, 523 (1964). A citizen's right to vote is not worth much if the law denies his or her candidate of choice the opportunity to run. "The rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlating effect on voters." *Bullock v. Carter,* 405 U.S. 134, 143, 92 S. Ct. 849, 856, 31 L. Ed. 2d 92, 99 (1972). As the United States Supreme Court observed in *Powell v. McCormack,* 395 U.S. 486, 548, 89 S. Ct. 1944, 1977, 23 L. Ed. 2d 491, 531 (1969):
>
> > "A fundamental principle of our representative democracy is, in Hamilton's words, 'that the people should choose whom they please to govern them.' 2 *Elliot's Debates,* 257. . . ."

*Billings*, 194 W. Va. at 305, 460 S.E.2d at 440.

In the case *sub judice*, the voters of the Ninth Senatorial District chose the person who they wanted to represent them during the 2012 senatorial election: Daniel Hall, a candidate representing the Democratic Party. As was his constitutionally-guaranteed prerogative, Senator Hall subsequently parted ways with the Democratic Party and joined the ranks of the Republican Party. Upon his departure from office, however, application of the

15

express language of W. Va. Code § 3-10-5 to name his replacement operates to disenfranchise the voters of the Ninth Senatorial District who, at the time of the 2012 election, selected Daniel Hall of the *Democratic* Party to represent them. This construction, dictated by the statute's plain language, effectively silences the voters' voice and cannot be reconciled with the voters' constitutional right to select a representative of their choosing guaranteed by article II, section 4.

> "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. *And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.*" (Italics supplied.)

*Lance v. Board of Educ. of Cnty. of Roane*, 153 W. Va. at 569, 170 S.E.2d at 789 (quoting *Reynolds v. Sims*, 377 U.S. at 555, 84 S. Ct. at 1378, 12 L. Ed. 2d 506 (footnote omitted)). *See also Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 655, 86 S. Ct. 1079, 1081, 16 L. Ed. 2d 169 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). Application of W. Va. Code § 3-10-5 as endorsed by the majority deprives the voters of their right to elect a candidate of their choosing, and, thus, is unconstitutional as violative of article II, section 4 of the West Virginia Constitution. Because "the judiciary . . . has a role to play in ensuring the [electoral] process retains its integrity and functions as an accurate reflection of the people's will," *Billings*, 194 W. Va. at 307, 460 S.E.2d at 442 (footnote omitted), I simply cannot countenance this incongruous result.

16

***Courts are Constituted to Faithfully Interpret and Apply the Law,***
***Not to Advance the Personal Objectives of Individual Justices***

As with all of the views espoused in my opinions, I reach my conclusion that

W. Va. Code § 3-10-5 is unconstitutional only after careful consideration and thorough

analysis of the parties' arguments and the law governing the subject controversy. As a

Justice of this State's highest court, I am honored to have been elected by this State's voters

and strive, in every case upon which I sit, to "support the Constitution of the United States

and the Constitution of this State" and to "faithfully discharge the duties of [my] office to the

best of [my] skill and judgment." W. Va. Const. art. IV, § 5. I also endeavor to faithfully

follow the Canons of Judicial Conduct, which require persons elected to judicial office to

"participate in establishing, maintaining, and enforcing high standards of conduct" and to

"personally observe those standards so that the integrity and independence of the judiciary

will be preserved." W. Va. Code Judicial Conduct Canon 1. *See also* W. Va. Code Judicial

Conduct Canon 2 (requiring judge "not to allow family, social, political, or other

relationships to influence the judge's judicial conduct or judgment").

When I disagree with a decision endorsed by the majority of this Court, I do

so because I interpret the law differently than my brethren. Simply because I do not share

my colleagues' point of view, though, does not mean that I do not still respect them both as

individuals and for their legal acumen. Rather, I reiterate the eloquent words of President

Haymond, who explained his decision to dissent from the majority of the Court thusly: "It

should be clearly understood that in expressing my dissentient views, however, in this honest and sincere disagreement between my associates and me, my criticisms are directed, not to them, but to their direction." *Lance v. Board of Educ. of Cnty. of Roane*, 153 W. Va. at 574, 170 S.E.2d at 791 (Haymond, President, dissenting).

We are *all*, *all five* of us Justices, constitutionally bound to uphold the laws of this State to the best of our ability and to do so with the neutrality expected of the judiciary. As officers of the Court, we are not beholden to personal agendas and do not use our position in the judiciary to advance our private interests. This is what the voters of the State entrusted us to do when they elected us, and this is what we do every day we serve as a Justice of this Honorable Court. The citizens of West Virginia deserve to understand the views I have expressed in this separate opinion explaining the Constitution's vital role in protecting not only their sacred right to vote but also in preserving the sanctity of the choices they make when they cast their ballots. In light of this obligation we *all* have assumed to interpret and apply the law to accomplish justice, I find it profoundly troubling that a commentary suggesting bias or impugning the integrity of a justice would ever have a place in a separate, concurring opinion–particularly when, by the very virtue of their assumption of office, it is axiomatic that *all* of the Justices of this Court exhibit neutrality and impartiality in their decisions interpreting the law.

It goes without saying that the case *sub judice* presented an interesting challenge for the Court's resolution. On the one hand, the instant proceeding involved a rather straightforward matter of statutory construction. On the other hand, there is entwined with this inquiry a constitutional concern of such great magnitude that the first step in such a statutory analysis, *i.e.*, ascertaining and adhering to the legislative intent, cannot possibly be accomplished without considering and deciding the constitutionality of the subject legislative enactment. While the parties have conceded that they largely abandoned their constitutional arguments in favor of proposing a more simplistic statutory construction analysis, such strategy gives short shrift to the ability of this Court to undertake and determine complicated questions of statutory construction and works a great disservice to the voters of this State whose right to be represented by the candidate of their choosing is at the very heart of their controversy. Although not artfully or thoroughly raised, the Petitioners did interject the constitutionality of W. Va. Code § 3-10-5 into this proceeding so as to permit the Court to determine whether this provision meets constitutional muster. Because the majority ignored this invitation, and its duty, to decide this singularly dispositive issue, I respectfully dissent.