474 S.E.2d 919

**STATE of West Virginia ex rel. William Edward SOWARDS II, Relator,**

v.

**COUNTY COMMISSION OF LINCOLN COUNTY; Paul D. Duncan, President, and Buster Stowers and Doug Waldron, Members; and Kim Cecil, Respondents.**

**STATE of West Virginia ex rel. Lewis WALKER, Jr., Relator,**

v.

**Paul LAMBERT, Clerk of the Circuit Court of McDowell County; and Pete J. Beavers, Respondents.**

**Nos. 23525, 23541.**

Supreme Court of Appeals of West Virginia.

Submitted June 25, 1996.

Decided July 17, 1996.

James M. Casey, Point Pleasant, for Relator Sowards.

J. David Cecil, Armada & Cecil, Hurricane, for Respondent Kim Cecil.

James M. Casey, Point Pleasant, and Charles H. Damron, Hamlin, for Relator Walker.

Lacy W. Wright, Jr., Welch, for Respondent Pete J. Beavers.

Sidney H. Bell, Pros. Atty. for McDowell County, Welch, for Respondent Paul Lambert.

CLECKLEY, Justice:

This case involves two mandamus actions challenging the eligibility of two candidates for elected offices in West Virginia. Both candidates are alleged to have maintained their civil service status while running for office. Finding common issues of law, we consolidated these actions for purposes of consideration and decision.

## I.

### FACTUAL BACKGROUND

The relator in the first mandamus action, William E. Sowards II, is a citizen and taxpayer of Lincoln County, West Virginia. Mr. Sowards argues that Respondent Kim Cecil who appears to have received the most votes in the May 14, 1996, primary election for the Democratic nominee for sheriff[1] is ineligible to serve because Mr. Cecil did not resign his civil service position as deputy sheriff when he ran for the Office of Sheriff. Although Mr. Cecil was laid off from his deputy sheriff position at all times during his bid for sheriff, Mr. Sowards alleges Mr. Cecil continued to maintain his rights under the civil service system including accruing retirement time, vacation time, and seniority. Mr. Sowards claims he also is a laid off deputy sheriff who

---

1. Mr. Cecil and Paul D. Duncan were the top vote getters in the Democratic primary for sheriff. Each candidate has filed for a recount of the votes. Mr. Cecil leads in the vote totals. At the time of this action, a winner had not been certified.

desired to run for sheriff but forewent the opportunity because he did not want to break the law by running without resigning and he did not want to resign and lose his civil service standing.

Mr. Sowards requests this Court to declare the Respondents County Commission of Lincoln County, West Virginia, sitting as a Board of Canvassers; Paul D. Duncan, President thereof, and Buster Stowers and Doug Waldron, Members thereof, (hereinafter Lincoln County Commission), whose responsibility it is to ascertain the true and actual results of the primary election, have a clear legal duty to not certify a winner as the Democratic nominee for sheriff. In addition, Mr. Sowards asks this Court to declare the Democratic nomination for Sheriff of Lincoln County as vacant and available to be filled by the appropriate Democratic committee.

In response to Mr. Sowards' petition, Mr. Cecil states he was a "provisional" deputy sheriff and is not entitled to recall under the civil service system because he was not working under the system. Mr. Cecil denies maintaining any rights of retirement time, vacation time, and seniority under the system except to the extent he may be recalled under the relevant deputy sheriff's civil service statute. Mr. Cecil admits to being qualified to receive unemployment compensation while laid off and states he has been informed by the current sheriff, Jackie Cooper, that his name is on the list of deputy sheriffs to be recalled if sufficient funds become available. In addition, Mr. Cecil asserts that before he ran for sheriff he received an opinion from the Chief of Staff of the Office of Secretary of State, William H. Harrington, informing him that he was not prohibited from seeking public office. Mr. Cecil attached an affidavit from Mr. Harrington confirming this fact.

Mr. Cecil admits that mandamus is the appropriate action to test a candidate's eligibility for public office, but he challenges Mr. Sowards' use of mandamus in this case. Mr. Cecil argues the Lincoln County Commission is not a proper party to this action but,

instead, Mr. Sowards should have named the Circuit Clerk of Lincoln County (hereinafter Lincoln Circuit Clerk). Mr. Cecil asserts the Lincoln County Commission has no authority to withhold the name of the successful Democratic sheriff nominee on the grounds alleged in the petition. Moreover, Mr. Cecil claims the petition only challenges his "right to continued coverage by the deputy sheriff's civil service system and has no bearing on his eligibility for public office." Therefore, Mr. Cecil moves this Court to dismiss or deny Mr. Sowards' petition and award Mr. Cecil costs and reasonable attorney's fees.

The second mandamus action before this Court was filed by Lewis Walker, Jr., who asserts he is a citizen and taxpayer of McDowell County, West Virginia. This action was brought against the Circuit Clerk of McDowell County (hereinafter McDowell Circuit Clerk), Paul Lambert, who is responsible for preparing and printing the ballot for the November general election, and Pete J. Beavers, who received the most votes to become one of the Democratic nominees for three available magistrate positions. Mr. Walker challenges the nomination of Mr. Beavers on the grounds Mr. Beavers merely received a leave of absence from his position as a deputy sheriff under the civil service system instead of resigning from that position to run for magistrate. Mr. Walker claims Mr. Beavers continued to accrue retirement time, vacation time, and seniority while on leave, and "has drawn compensation as a deputy while filing for and running a partisan campaign for magistrate." Mr. Walker asserts Mr. Beavers should have resigned his position prior to filing and, because he did not resign, he was not eligible to run and the McDowell Circuit Clerk has a clear legal duty to remove Mr. Beavers' name from the November ballot. Mr. Walker requests this Court to declare the nomination vacant and subject to being filled by the appropriate Democratic committee. Mr. Walker attached an affidavit from himself attesting to many of the above facts.

In response, Mr. Beavers asks this Court to deny Mr. Walker's petition and award Mr.

Beavers attorney's fees and costs for the following reasons. Mr. Beavers claims he requested and received a leave of absence to run for a magistrate position. By letter dated December 20, 1995, Donald L. Hicks, the current Sheriff of McDowell County, informed the Honorable William Kendrick King, Judge of the Circuit Court of McDowell County, that Mr. Beavers would be granted a leave of absence and would not be covered by civil service. On December 26, 1995, Judge King replied to Sheriff Hicks' letter and said Mr. Beavers would be retained as a civilian bailiff in the circuit court. Mr. Beavers officially requested his leave of absence by letter dated January 7, 1996. Sheriff Hicks replied by letter dated that same day and stated, in part, Mr. Beavers' "leave of absence will begin on January 8, 1996 and continue until the day after the 1996 Primary Election, provid[ed] [he is] unfortunate in [his] bid[.]" If successful in the primary, Mr. Beavers' leave is to continue until his political involvement ceases. By letter dated January 10, 1996, Sheriff Hicks informed the McDowell County Commission that Mr. Beavers was granted a leave of absence and would not be covered under the civil service system.

An affidavit was filed by Judge King which states Mr. Beavers has worked as a civilian bailiff for the circuit court since he took a leave of absence as deputy sheriff. Judge King also stated he told Mr. Beavers he saw no impediment to him running for the Office of Magistrate but, by seeking office, Mr. Beavers may forfeit his right to be returned to the position of a civil service deputy sheriff. Another affidavit from Philip A. LaCaria, the Chairperson of the Deputy Sheriffs' Civil Service Commission, was submitted on behalf of Mr. Beavers. Mr. LaCaria stated there was "no objection or problem insofar as the Commission was concerned" with Mr. Beavers taking a leave of absence and relinquishing his coverage under civil service while he campaigned.

The McDowell Circuit Clerk also responded to this action. In addition to making

statements in support of Mr. Beavers' eligibility to run for office, the McDowell Circuit Clerk argues mandamus to remove Mr. Beavers from the ballot is not an appropriate remedy in this case because, in the alternative, an action should be brought before the Deputy Sheriffs' Civil Service Commission pursuant to W. Va.Code, 7–14–15 (1971), to determine if Mr. Beavers should be discharged from his employment. The McDowell Circuit Clerk also asserts the doctrine of laches should apply in that Mr. Beavers' candidacy was not challenged until after the primary election. Thus, the McDowell Circuit Clerk requests this Court to deny Mr. Walker's petition.

## II.

### DISCUSSION

The relators petition this Court for writs of mandamus directing the Lincoln County Commission and the McDowell Circuit Clerk to vacate the present Democratic nominees, Kim Cecil, for Sheriff of Lincoln County, and Pete J. Beavers, for Magistrate in McDowell County, from the official ballot of each respective county. In their petitions, they claim both candidates have acted illegally and in violation of state law prohibiting them from engaging in political activities. As urged by the relators, the only appropriate remedy are writs of mandamus ordering their disqualification as candidates for the political offices for which they were nominated. We find that the relators have standing to bring this action:

"'A citizen, tax payer and voter has such interest as entitles him to maintain mandamus to compel a board of ballot commissioners to discharge their duties lawfully in respect to the preparation of ballots for a general election.'" Syl. pt. 2, *State ex rel. Zickefoose v. West*, 145 W.Va. 498, 116 S.E.2d 398 (1960), *quoting* Syl. pt. 1, *State ex rel. Pack v. Karnes*, 83 W.Va. 14, 97 S.E. 302 (1918).[2]

For the reasons set forth below, however, we deny the relators' requests for the writs of mandamus.

2. Both *State ex rel. Zickefoose* and *Pack* were   overruled on other grounds in *State ex rel. Booth*

## A.

### Standard for Granting a Writ of Mandamus

■ W.Va.Code, 53–1–2 (1933), and Section 3 of Article VIII of the West Virginia Constitution vest this Court with original jurisdiction to issue writs of mandamus. *See State ex rel. Summerfield v. Maxwell,* 148 W.Va. 535, 135 S.E.2d 741 (1964). W. Va. Code, 3–1–45 (1963), as amended, specifically sanctions writs of mandamus in election disputes. *See Marquis v. Thompson,* 109 W.Va. 504, 155 S.E. 462 (1930) (the remedy particularly is appropriate in election disputes where speedy settlement is required). As we recently stated in *McComas v. Board of Education of Fayette County,* 197 W.Va. 188, 192, 475 S.E.2d 280, 284 (1996):

"[M]andamus is a drastic remedy to be invoked only in extraordinary situations[; therefore], a party seeking such a writ must satisfy three conditions: (1) there are no adequate means for the party to obtain the desired relief; (2) the party has a clear and indisputable right to the issuance of the writ; and (3) there is a legal duty on the part of the respondent to do that which the petitioner seeks to compel. *See* Syl. Pt. 1, *State ex rel. Billings v. Point Pleasant,* 194 W.Va. 301, 460 S.E.2d 436 (1995)."

"The issuance of a writ of mandamus is normally inappropriate unless the right or duty to be enforced is nondiscretionary."

*McComas,* 197 W.Va. at 188, 475 S.E.2d at 280. The significance of the term "nondiscretionary" cannot be overstated in election cases that seek to restrict candidacies. The fundamental and constitutional right to run for public office cannot be denied unless necessary to achieve a compelling state interest. It is only when the writ has been invoked to preserve the right to vote or to run for political office that this Court has eased the requirements for strict compliance for the writ's preconditions, especially those relating to the availability of another remedy. *Billings,* 194 W.Va. at 303 n. 1, 460 S.E.2d at 438 n. 1; *State ex rel. Thomas v. Wysong,* 125 W.Va. 369, 372, 24 S.E.2d 463, 465 (1943) ("[i]f the relator has a clear legal right to the office claimed by him and from which he is legally excluded, mandamus is the appropriate remedy." (Citations omitted)); Syl. pt. 2, *State ex rel. Bromelow v. Daniel,* 163 W.Va. 532, 258 S.E.2d 119 (1979) ("[b]ecause ... there is an important public policy interest in determining the qualifications of candidates in advance of an election, this Court does not hold an election mandamus proceeding to the same degree of procedural rigor as an ordinary mandamus case").[3] Thus, the public policies in protecting fundamental rights, preserving electoral integrity, and promoting both political and judicial economy have prompted a practical approach in assessing whether an election case is appropriate for mandamus relief. Although we believe that W. Va.Code, 7–14–15(b),[4] provides the exclusive remedy for the relators under these

*v. Board of Ballot Comm'rs of Mingo County,* 156 W.Va. 657, 196 S.E.2d 299 (1973).

**3.** As we stated in *Billings,* 194 W.Va. at 304, 460 S.E.2d at 439, "[o]nce [the mandamus] prerequisites are met, this Court's decision whether to issue the writ is largely one of discretion." (Footnote omitted). However, there can be no doubt that mandamus is an appropriate remedy in election dispute cases. *See Benson v. Robertson,* 159 W.Va. 674, 226 S.E.2d 447 (1976); *State ex rel. Smoleski v. County Court of Hancock County,* 153 W.Va. 21, 166 S.E.2d 777 (1969); *State ex rel. Summerfield, supra; Kirkpatrick v. Deegans,* 53 W.Va. 275, 44 S.E. 465 (1903). The principal purpose of the liberalized election mandamus is to provide an expeditious pre-election hearing to resolve eligibility of candidates, so that voters can exercise their fundamental fran-

chise rights as to all eligible candidates. *State ex rel. Bromelow, supra.*

**4.** W. Va.Code, 7–14–15(b), provides, in pertinent part:

"Any three residents of the county may file their written petition with the civil service commission thereof setting out therein the grounds upon which a deputy sheriff of such county should be removed for a violation of subsection (a) of this section.... The commission at the conclusion of the hearing, or as soon thereafter as possible, shall enter an order sustaining in whole or in part the charges made, or shall dismiss the charges as unfounded. In the event the charges are sustained in whole or in part, the order shall also declare the appointment of such deputy to be vacated

circumstances, we nevertheless proceed to review these consolidated cases because a decision on the merits "may be especially appropriate to further supervisory and instructional goals" of our political and governmental institutions when handling similar questions raised in these petitions. *Billings*, 194 W.Va. at 304 n. 2, 460 S.E.2d at 439 n. 2.

## B.

### *Analysis*

The merits of the present controversy raise intriguing and significant problems.

We must determine the propriety of disqualifying two Democratic Party nominees because, at the time of their campaigns and elections, a term of their employment barred them from participating in partisan political activities. Our resolution must come as close as possible to striking a balance between maintaining the integrity of the election process and preventing our civil service laws from being unjustly compromised. Although we cannot ignore the fact, as urged by the respondents, that the challenges presented herein should have come before the election,[5] Syl. pt. 2, *State ex rel. Zickefoose, supra,* to provide guidance for future purposes, "we

and thereupon the sheriff shall immediately remove the deputy from his office and from the payroll of the county."

5. There are at least two valid grounds for the summary rejection of these petitions. First, "[o]nce an election is held, ... sound public policy dictates that newly elected officials not be vexed by continuing law suits" of matters that could have been raised before such an election. *Marra v. Zink,* 163 W.Va. 400, 402, 256 S.E.2d 581, 583 (1979).

Second, there are practical, as well as legal, reasons to hold that the provisions of W. Va. Code, 7–14–15, are inapplicable to a deputy sheriff who has obtained a leave of absence from that position expressly for the purpose of running for political office and to a deputy sheriff who was laid off from his employment at the time he engaged in the alleged political activity. W. Va. Code, 7–14–2(a)(2) (1978), provides, in part, that " '[d]eputy sheriffs' or 'deputies' shall mean persons appointed by a sheriff as his deputies whose primary duties as such deputies are within the scope of *active,* general law enforcement and as such are authorized to carry deadly weapons, patrol the highways, perform police functions, make arrests or safeguard prisoners." (Emphasis added). It reasonably could be argued that at the time of the political activity neither respondent candidate was "active" nor permitted to engage in the law enforcement duties required of deputy sheriffs.

More significantly, W. Va.Code, 7–14–15, does not directly address the issue relevant here: Whether its provisions apply to persons who are on furlough or leave of absence, with or without pay. Unquestionably, the Legislature under its plenary powers could provide that persons laid off or on a leave of absence are subject to the "political activity" prohibition. Indeed, this very issue has been the subject of conflicting federal opinions and debate on the floor of Congress. In *Johnson v. Cushing,* 483 F.Supp. 608, 611 (D.Minn.1980), the court held the Hatch Political Activities Act (the Hatch Act), "while it applies to

persons presently employed by the State Department of Economic Security, does not apply to persons who have been granted leaves of absence[.]"

On the other hand, the same court, but a different judge, determined that the legislative history of the Hatch Act supports the conclusion that a covered employee on leave of absence without pay is subject to the Act. In *Minnesota Department of Jobs and Training v. United States Merit Systems Protection Board,* 666 F.Supp. 1305 (D.C.Minn.1987), *rev'd on other grounds* 858 F.2d 433 (8th Cir.1988), the court observed that at the time of the passage of the Hatch Act, the Honorable Orrin G. Hatch, Senator for the State of Utah, himself offered as part of its legislative history an interpretive summary suggesting the Act's coverage include "[t]emporary employees, substitutes, and persons on furlough or leave of absence with or without pay[.]" 666 F.Supp. at 1308, *quoting* 86th Cong. Rec. § 2942–43 (Daily ed. March 15, 1940) (statement of Senator Hatch). Although an amendment offered would have made the Hatch Act inapplicable to persons on leave of absence without pay, the amendment was withdrawn when the Honorable Lewis B. Schwellenbach, Senator for the State of Washington, vehemently argued he knew "of nothing which might involve more impure politics than a man who occupies an executive position, who has under him a large number of employees, to take a leave of absence with the understanding that he is going to run for office and then come back and again hold his office if he is defeated in the election." 86th Cong. Rec. § 2872 (Daily ed. March 14, 1940) (statement of Senator Schwellenbach). Based on this legislative history, the court held an "employee, as defined in 5 U.S.C. § 1501(4), who runs for public office in a partisan election, even if on approved leave without pay, is in violation of federal law." 666 F.Supp. at 1309.

Obviously, the danger of coercion and implicit intimidation envisioned by Senator Schwellenbach is even more pronounced when a deputy sheriff on leave of absence is seeking the position of sheriff or magistrate, positions that may very

prefer to rest our determination of the issue in [these] case[s] on the question of . . . [the respondent nominees'] eligibilit[ies] which [are] fairly raised on the record and which we believe cannot be ignored." *State ex rel. Thomas v. Wysong,* 125 W.Va. at 375, 24 S.E.2d at 467.

Any effort to strike a candidate's name from a ballot quite obviously invokes serious constitutional concerns. As we have often noted, the West Virginia Constitution "confers a fundamental right to run for public office," [6] and the provisions of the Constitution provide the primary, if not the exclusive, authority for determining who may or may not seek public office. *E.g., Sturm v. Henderson,* 176 W.Va. 319, 342 S.E.2d 287 (1986); *Marra v. Zink,* 163 W.Va. 400, 256 S.E.2d 581 (1979); cf. *United States Term Limits, Inc. v. Thornton,* — U.S. —, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (term limits on congressional candidates violate the United States Constitution).

▪ The issue raised by the relators not only implicates the right to seek public office but also the right of citizens to vote for candidates of their choice. The right to vote, in turn, helps to preserve all other rights because it provides the people with the ultimate means of expressing their will and directing the public policy of the State and its subsidiary units. Consequently, as Chief Justice Warren put it: "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v.*

*Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506, 523 (1964); *see also Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 492 (1964) ("[o]ther rights, even the most basic, are illusory if the right to vote is undermined"). Neither the right to candidacy nor franchise, however, are immune from regulation. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714, 723 (1974). To that end, the State retains the authority to prescribe reasonable rules for the conduct of elections, reasonable procedures by which candidates may qualify to run for office, and the manner in which they will be elected. *See* Syl. pt. 2, *Adkins v. Smith,* 185 W.Va. 481, 408 S.E.2d 60 (1991) (the power of the Legislature to prescribe essential qualifications to be possessed by candidates in order to be eligible to be nominated or elected is plenary within constitutional limitations).

▪ The State has a valid interest in preserving the integrity and reliability of both the electoral process and its civil service laws. Certainly, the West Virginia Legislature may place limits on campaigning by public employees if the limits substantially serve state interests that are " 'important' enough to outweigh the employee's First Amendment rights." *Magill v. Lynch,* 560 F.2d 22, 27 (1st Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763

well determine fellow deputy sheriffs' future success or failure in law enforcement. Nevertheless, we do not have the benefit of any legislative history to discern legislative intent. A fundamental rule of statutory construction is to ascertain and, if possible, give effect to the intention and purpose of the Legislature as expressed in a statute. Absent plain language that would indicate a legislative intent to extend coverage of W. Va.Code, 7–14–15, to one on an unpaid leave of absence, we will not assume the intent to do so from legislative silence. To do so would suggest the Legislature lacks the ability to graft a statute with such clarity, and we refuse to indulge in so cynical a view of the legislative process.

Another compelling reason to reject the relators' efforts to apply W. Va.Code, 7–14–15, to the respondent nominees is the absence of bad faith or willfulness on their part. It appears to this Court that the respondent nominees were acting in good faith, taking all possible steps known to them to comply with the laws of this State. We must conclude that their acts, even if violative of State law, were not willful, and it would be profoundly unfair to hold that their acts constitute the kind of grievous misbehavior that would justify our nullification of a popular election by mandamus.

**6.** *State ex rel. Billings v. Point Pleasant,* 194 W.Va. at 305, 460 S.E.2d at 440.

(1978), *citing United States Civil Service Comm'n v. National Ass'n of Letter Carriers, AFL–CIO,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2889–90, 37 L.Ed.2d 796, 808 (1973). *See also Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In *Letter Carriers* and *Broadrick,* the United States Supreme Court recognized that our history as a democratic nation demonstrates that prohibiting partisan political activity of public employees ensures they serve the public and not a political party. Thus, a legislative body may bar a public employee from becoming a candidate for an elected office not only to prevent potential conflict in the workplace between the employee and the supervisor-incumbent during the campaign, but also to prohibit any tacit coercion of fellow employees and subordinates to assist in a political campaign. This policy promotes efficiency and integrity in law enforcement ranks and also prevents both "danger to the service in that political rather than official effort may earn advancement and to the public in that governmental favor may be channeled through political connections." *United Pub. Workers v. Mitchell,* 330 U.S. 75, 98, 67 S.Ct. 556, 569, 91 L.Ed. 754, 772 (1947).

Similarly, the history of this Court's interpretation of W. Va.Code, 7–14–15(a), makes it abundantly clear that the Legislature has the power to regulate partisan political activities of deputy sheriffs. *See Deeds v. Lindsey,* 179 W.Va. 674, 371 S.E.2d 602 (1988); *Weaver v. Shaffer,* 170 W.Va. 107, 290 S.E.2d 244 (1980). The necessity for legislation in this area has been amply demonstrated. *See Hall v. Protan,* 156 W.Va. 562, 195 S.E.2d 380 (1973). The State has a greater interest in regulating the political activities of its police officers than it would have in regulating the political activities of its citizenry in general. *See Weaver,* 170 W.Va. at 109, 290 S.E.2d at 246, *citing Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The possibility of coercion of employees by superior officers remains a strong factor in state, county, and municipal elections; hence, it is in the inter-

est of the State that employees achieve advancements on their merit and that they be free from coercion and prospective favor from political activity. *See Weaver,* 170 W.Va. at 112, 290 S.E.2d at 249 (without civil service laws prohibiting political activities, officers could "achieve increases in salary, lavish perquisites, and opulent working conditions through political extortion").

■ The Legislature also has an interest in removing even the implication of impropriety from law enforcement whose very effectiveness and success is dependent upon its freedom from political influence. That is, the State has a compelling interest in preserving the political neutrality—and avoiding even the appearance of political partisanship—in stocking and maintaining the ranks of those charged with enforcing the law. *Weaver, supra; cf., e.g., Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (reliance on political patronage as a basis for most county employment violates public employees' First Amendment rights). For these reasons, it is constitutionally permissible to suspend, or even to discharge, a deputy sheriff who seeks political office. As long as the political activity limitation does not infringe on the deputy sheriff's access to the ballot box or his or her ability to participate in nonpartisan political discussions and activities, the requirement of orderly management of law enforcement personnel outweighs the limited infringement on the First Amendment. *Mitchell,* 330 U.S. at 94, 99, 67 S.Ct. at 566, 569, 91 L.Ed. at 772–73.

Against this backdrop, we proceed to consider the specifics of the relators' challenges. Their claims are not that the nominees should be sanctioned as deputy sheriffs for engaging in political activities. Rather, the relators contend that, because the law regulating the deputy sheriffs' employment precluded them from simultaneously serving as deputy sheriffs and running for office (and assuming their leave status did not alter their status as deputy sheriffs), they are unable to legally qualify as candidates for the offices they seek. Because the relators have

presented us with no direct authority for this proposition, we must assume they believe that disqualification as a candidate inexorably flows from deputy sheriffs' engaging in political activities. In essence, the relators contend that the statutory scheme prohibiting political activity of deputy sheriffs would be ineffective if the deputies were allowed to reap the fruits of their political activities. Thus, granting relief to the relators would call on courts to impose sanctions on politically active deputy sheriffs over and above the sanctions explicitly provided by the Legislature. In the relators' view, the public's only effective safeguard against this type of political activity by deputy sheriffs is disqualification. On the other hand, the respondents caution us there is no direct authority in the West Virginia Constitution giving this Court (or the Legislature, for that matter) authority to establish qualifications to seek office in excess of those imposed by the Constitution and we should be ever reluctant to impose our will in violation of the freedom of speech and assembly provisions of the Constitution. *See generally Sturm v. Henderson, supra.*

■ We decline to exercise the power the relators urge upon us. The Legislature fully and carefully set forth in W. Va.Code, 7–14–15, what are the appropriate sanctions for deputy sheriffs who engage in partisan politics. Subsection (a) provides, in pertinent part:

> "[N]o deputy sheriff covered by the provisions of this article shall engage in any political activity of any kind, character or nature whatsoever, except to cast his vote at any election or shall act as an election official in any municipal, county or state election. *Any deputy sheriff violating the provisions of this section shall have his appointment vacated and he shall be removed, in accordance with the pertinent*

*provisions of this section."* (Emphasis added).

In addition, subsection (b) gives the public a means for enforcing the substantive proscription of subsection (a) by authorizing any three residents of a county to initiate a petition for removal of any deputy sheriff believed to be engaging in partisan politics. *See* note 3, *supra, quoting* subsection (b). We believe W. Va.Code, 7–14–15, therefore, captures all the Legislature concluded was necessary to give effect to its regulation, and we see no reason for inferring any additional power on the courts. We also reject any contention there is some abstract constitutional right of the public to have deputy sheriffs who are otherwise qualified to hold office thrown off the ballot. As this Court stated in *Isaacs v. Board of Ballot Commissioners,* 122 W.Va. 703, 707, 12 S.E.2d 510, 512 (1940): "The inhibition of the constitution should not be given a more far-reaching meaning and effect than its wording and spirit require."[7]

Moreover, we believe the nominees' rights, to which we alluded above, warrant a rejection of the requested relief. In characteristically pithy terms, the Honorable Oliver Wendell Holmes, Justice, long ago penned that the "petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor, City of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892). Although that epigram no longer captures the state of the free speech doctrine,[8] its converse certainly remains vital: Even if an individual does not have a constitutional right to be a police officer, he or she does have a right to talk— and engage in—politics. It is one thing to disqualify a candidate from being a deputy sheriff, it is quite another to disqualify a nominated deputy sheriff from being a candidate. Moreover, voters have a right to expect their electoral choices to be honored by the State.

**7.** The claim in *Isaacs* was much stronger than exists in this case. At least in *Isaacs* the relators could point to candidate qualifications specifically stated in the Constitution. Such situation is not the case here.

**8.** *E.g., Keyishian v. Board of Regents of University of State of N.Y.,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); William W. Van Alstyne, *The Demise of the Right–Privilege Distinction in Constitutional Law,* 81 Harv. L.Rev. 1439 (1968).

To achieve the goal of enfranchisement wherever possible, we believe judicial authority to take a candidate off the ballot, especially after the voters have expressed their preference, should be sparingly used. Referring to restraint in this area as a "just and magnanimous judicial approach[,]" this Court in *Isaacs* stated: "The right of a citizen to hold office is the general rule; ineligibility the exception. Courts are hesitant to take action resulting in deprivation of the privilege to hold office, except under clear and explicit constitutional ... requirement." 122 W.Va. at 705, 12 S.E.2d at 512. Political candidacy is a fundamental interest which can be trod upon only if less restrictive alternatives are not available. It is only when an election has been subverted by a candidate's clear constitutional or statutory disqualification, bribery, fraud, intimidation, or similar unlawful conduct that a court should invalidate the preference of the voters and, in effect, annul the election. Therefore, we hold that a mere violation of W. Va.Code, 7–14–15(a), is insufficient to set aside an election and, in effect, disenfranchise the voters of a county. The sanctity of the ballot, which is the keystone of our democracy, must be preserved.

We are not prepared to say that a violation of W. Va.Code, 7–14–15(a), can never lead to a successful nominee's disqualification. However, in the absence of egregious conduct amounting to fraud, bribery, or coercion, we remain reluctant to declare the disqualification of a nominee. It is our constitutional obligation to construe the laws of West Virginia, whenever reasonable, consistent with the right to vote and to seek office. *See State ex rel. Thomas v. Wysong*, 125

W.Va. at 377, 24 S.E.2d at 467 ("[i]n our own jurisdiction a liberal view with respect to eligibility to office has been adopted"); *MacCorkle v. Hechler*, 183 W.Va. 105, 106, 394 S.E.2d 89, 90 (1990) (" '[a] liberal application of any statute should be made so as to afford the citizens of this State ... an opportunity to vote for the persons of their choice.' " (Citation omitted)).

### III.

### CONCLUSION

Parties seeking a writ of mandamus bear the burden of proving that the right to the desired relief is clear and indisputable. Far from being clear and indisputable, we are unable to find any abuse of discretion or usurpation of administrative or executive power justifying the imposition of this drastic remedy. Because we have determined that W. Va.Code, 7–14–15(b), provides the exclusive remedy for violations under W. Va.Code, 7–14–15(a), we deny the petitions for writs of mandamus. We express no opinion as to whether further proceedings under W. Va. Code, 7–14–15(b), may be brought at this juncture.[9]

Writs denied.

---

**9.** Additionally, we reject the respondent nominees' claims for attorneys' fees. Although not directly applicable, we find guidance in *State ex rel. West Virginia Highlands Conservancy, Inc. v. West Virginia Division of Environmental Protection*, 193 W.Va. 650, 458 S.E.2d 88 (1995), wherein we suggested in Syllabus Point 4 that a primary factor in considering the propriety of an attorney's fee award arising out of a mandamus action is "the relative clarity by which the legal duty was established[.]" At the time this action was filed, this Court had made no definitive ruling regarding the exclusivity of W. Va.Code, 7–14–15(b), and its implication to the electoral process. We, therefore, exercise our discretion and deny the requested awards of attorneys' fees.