IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2018 Term

_____

No. 18-0712

_____

FILED

**October 5, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL. DONALD L. BLANKENSHIP
AND THE CONSTITUTION PARTY OF WEST VIRGINIA,
Petitioners

v.

MAC WARNER, IN HIS OFFICIAL CAPACITY AS WEST VIRGINIA
SECRETARY OF STATE,
Respondent

_____

WRIT DENIED

_____

Submitted: August 29, 2018
Filed: October 5, 2018

Robert M. Bastress, Jr., Esq.
Morgantown, West Virginia
Counsel for Petitioners

Nigel E. Jeffries, Esq.
South Charleston, West Virginia
Counsel for Intervenor Nigel E.
Jeffries

Marc E. Williams, Esq.
Melissa Foster Bird, Esq.
Christopher Smith, Esq.
Anna C. Majestro, Esq.
Nelson Mullins Riley & Scarborough LLP
Huntington, West Virginia
Counsel for Respondent

Elbert Lin, Esq.
Hunton Andrews Kurth LLP
Richmond, Virginia
J. Mark Adkins, Esq.
Richard R. Heath, Jr., Esq.
Bowles Rice LLP
Charleston, West Virginia
Counsel for Intervenor The West Virginia
Republican Party, Inc.

JUSTICE FARRELL delivered the Opinion of the Court.

CHIEF JUSTICE WORKMAN is disqualified.
JUSTICE ALLEN H. LOUGHRY II suspended, therefore not participating and
JUSTICE PAUL T. FARRELL sitting by temporary assignment.
JUSTICE ALAN D. MOATS and JUSTICE DARRELL PRATT sitting by temporary assignment.

SYLLABUS BY THE COURT

1.     "The Constitution, in article IV, section 11, gives wide powers to the legislature to make all reasonable regulations and restrictions as to preparation of ballots and the conduct and return of elections." Syl. Pt. 4, *Morris v. Board of Canvassers of City of Charleston*, 49 W.Va. 251, 38 S.E. 500 (1901).

2.     "A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith." Syl. Pt. 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908).

3.     "It is the duty of a court to construe a statute according to its true intent, and give to it such construction as will uphold the law and further justice. It is as well the duty of a court to disregard a construction, though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity." Syl. Pt. 2, *Click v. Click*, 98 W.Va. 419, 127 S.E. 194 (1925).

4. West Virginia Code § 3-5-23(a) (2018) prevents unsuccessful primary election candidates from subsequently running as nomination-certificate candidates in the general election.

5. "The title to an act of the Legislature which amends and reenacts a particular section, article and chapter of the Code by specific reference to them, and which relates to an object as to which, and as to the original section of the Code, the provisions of the act are not foreign, but are congruous and germane and such as might have been incorporated in the section when enacted, and which title is broad enough to give a fair and reasonable indication of the purposes, but does not disclose the details, of the act, satisfies the requirements of Section 30, Article VI of the Constitution of this State and is valid." Syl. Pt. 3, *Wheeling v. Casualty Co.*, 131 W.Va. 584, 48 S.E.2d 404 (1948).

6. The title to H.B. 2981 (2009), an act to amend and reenact West Virginia Code §§ 3-5-7, 3-5-23, and 3-5-24, is constitutionally sufficient under Article VI, Section 30 of the West Virginia Constitution.

7. "Equal protection of the law is implicated when a classification treats similarly situated persons in a disadvantageous manner." Syl. Pt. 2, in part, *Israel v. Secondary Schools Act. Com'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989).

8. "West Virginia's constitutional equal protection principle is a part of the Due Process Clause found in Article III, Section 10 of the West Virginia Constitution." Syl. Pt. 4, *Israel v. Secondary Schools Act. Com'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989).

9. "The State of West Virginia through its Legislature retains the authority to prescribe reasonable rules for the conduct of elections, reasonable procedures by which candidates may qualify to run for office, and the manner in which they will be elected." Syl. Pt. 4, *State ex rel. Sowards v. County Comm'n of Lincoln Cty.*, 196 W.Va. 739, 474 S.E.2d 919 (1996).

10. West Virginia Code § 3-5-23(a) (2018), which prevents unsuccessful primary election candidates from subsequently running as nomination-certificate candidates, does not violate the constitutional guarantees of freedom of association and equal protection.

FARRELL, Justice:

On August 9, 2018, the petitioners, Donald Blankenship and the Constitution Party of West Virginia, petitioned this Court requesting the issuance of a writ of mandamus directing the respondent, Mac Warner, West Virginia Secretary of State, to list Mr. Blankenship as a candidate for the United States Senate on the general election ballot as the Constitution Party's nominee.

Secretary Warner subsequently filed a response to the petition. Intervenor briefs were filed by the The West Virginia Republican Party, Inc., and Nigel E. Jeffries.

On August 23, 2018, this Court issued a rule to show cause and ordered Secretary Warner to show cause, if any, why a writ of mandamus should not be awarded as requested by the petitioners. Oral argument was conducted on August 29, 2018.[1] For the reasons set forth herein, we deny the writ.

## I. Factual and Procedural Background

In the May 2018 primary election, Mr. Blankenship sought but failed to win the Republican Party's nomination for the United States Senate. Thereafter, on May 21,

---

[1] Given the request for accelerated consideration and resolution of this case as it relates to the preparation of the ballot for the 2018 general election, this Court announced its decision in an August 29, 2018, order, denying the petitioners relief and indicating that this detailed opinion would follow.

2018, Mr. Blankenship changed his party registration to the Constitution Party. On July 17, 2018, the Constitution Party notified the Secretary of State that Mr. Blankenship would be that party's nominee for the United States Senate.[2] On July 24, 2018, Mr. Blankenship filed with the Secretary of State's office his "Candidate's Certificate of Announcement for 2018 Elections" indicating his intention to run as a Constitution Party candidate. Mr. Blankenship paid the required filing fee and presented the signatures of a sufficient number of registered voters as specified by West Virginia Code § 3-5-23 (2018) the statute that governs certificate nominations.[3]

In a letter dated July 26, 2018, Secretary Warner denied Mr. Blankenship's certification as a Constitution Party candidate based upon West Virginia Code § 3-5-23, explaining that the statute precludes him from utilizing the nomination-certificate process

---

[2] There are two pathways that citizens in West Virginia may take to become a candidate for public office in the general election. One pertains to candidates of political parties recognized under State law. According to West Virginia Code § 3-1-8 (1965), a "political party" is "any affiliation of voters representing any principle or organization which at the last preceding general election, polled for its candidate for Governor at least one percent of the total number of votes cast for all candidates for that office in the state." Based upon the results of the last general election, there are four recognized political parties in West Virginia: Democrat, Republican, Mountain, and Libertarian. The other pathway is for candidates of unrecognized parties provided for in West Virginia Code § 3-5-23 (2018). Unrecognized parties, like the Constitution Party, must utilize the nomination-certificate process which requires collecting a certain number of signatures of registered voters.

[3] According to West Virginia Code § 3-5-23(c), "[t]he number of signatures shall be equal to not less than one percent of the entire vote cast at the last preceding general election for the office in the state, district, county, or other political division for which the nomination is to be made." Other portions of West Virginia Code § 3-5-23 are quoted in section III, *infra.*

to become a candidate in the general election because he lost the Republican Party Primary. Upon receipt of Secretary Warner's letter, Mr. Blankenship and the Constitution Party filed this petition for a writ of mandamus.

## II. STANDARD OF REVIEW

It is axiomatic that "[m]andamus is a proper remedy to require the performance of a nondiscretionary duty by various governmental agencies or bodies." Syl. Pt. 1, *State ex rel. Allstate Ins. Co. v. Union Pub. Serv. Dist.*, 151 W.Va. 207, 151 S.E.2d 102 (1966). Generally,

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought, (2) a legal duty on the part of the respondent to do the thing which the petitioner seeks to compel, and (3) the absence of another adequate remedy.

Syl. Pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969).

Because of the need for promptness in cases affecting the right to political office, this Court has recognized that "[i]n West Virginia a special form of mandamus exists to test the eligibility to office of a candidate in either a primary or general election." Syl. Pt. 5, in part, *State ex rel. Maloney v. McCartney*, 159 W.Va. 513, 223 S.E.2d 607 (1976). "Because there is an important public policy interest in determining the qualifications of candidates in advance of an election, this Court does not hold an election mandamus proceeding to the same degree of procedural rigor as an ordinary mandamus case." Syl. Pt. 2, *State ex rel. Bromelow v. Daniel*, 163 W.Va. 532, 258 S.E.2d 119 (1979).

3

We have explained that "when a writ of mandamus has been invoked to preserve the right to vote or to run for political office . . . this Court has eased the requirements for strict compliance for the writ's preconditions, especially those relating to the availability of another remedy." Syl. Pt. 3, in part, *State ex rel. Sowards v. County Comm'n of Lincoln Cty.*, 196 W.Va. 739, 474 S.E.2d 919 (1996).

Having set forth the proper standards governing our review of this case, we now turn to a discussion of the parties' arguments and the substantive law.

## III. DISCUSSION

The petitioners argue that West Virginia Code § 3-5-23(a) does not disqualify Mr. Blankenship because he is *now not* a candidate in any primary election for public office. The petitioners further aver that the purpose of the statute is to prevent the practice of "cross filing," whereby a person may appear on the general ballot not only as the nominee of a recognized party but also as an independent candidate or as a candidate of an unrecognized party. The petitioners assert both statutory and constitutional challenges to the Secretary of State's action.

Before we reach the issues in this case, we note that the West Virginia Constitution authorizes the Legislature to make laws concerning the election of public officials. This Court has held that "[t]he Constitution, in article IV, section 11, gives wide powers to the legislature to make all reasonable regulations and restrictions as to

4

preparation of ballots and the conduct and returns of elections." Syl. Pt. 4, *Morris v. Bd. of Canvassers of City of Charleston,* 49 W.Va. 251, 38 S.E. 500 (1901). Specifically, Article IV, Section 8 provides that "[t]he legislature, in cases not provided for in this Constitution, shall prescribe, by general laws, the terms of office, powers, duties and compensation of all public officers and agents, and the manner in which they shall be elected, appointed and removed." Article IV, Section 11 provides that

> [t]he legislature shall prescribe the manner of conducting and making returns of elections, and of determining contested elections, and shall pass such laws as may be necessary and proper to prevent intimidation, disorder or violence at the polls, and corruption or fraud in voting, counting the vote, ascertaining or declaring the result, or fraud in any manner, upon the ballot.

Finally, this Court is mindful that the Legislature "inevitably must[] enact reasonable regulations of parties, elections, and ballots to reduce election-and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citations omitted). Against this backdrop, we proceed to address the parties' arguments.

## *A. The Meaning of West Virginia Code § 3-5-23(a)*

Secretary Warner determined that West Virginia Code § 3-5-23(a) renders Mr. Blankenship ineligible to run as a Constitution Party candidate in the general election. The statute provides in relevant part:

> Groups of citizens having no party organization may nominate candidates who are not already candidates in the primary election for public office otherwise than by conventions or primary elections. In that case, the candidate or candidates, jointly or severally, shall file a nomination

5

certificate in accordance with the provisions of this section and the provisions of § 3-5-24 of this code.

It is Secretary Warner's position that the words "who are not already candidates in the primary election" in West Virginia Code § 3-5-23(a) constitute a "sore loser" or "sour grapes" law. Secretary Warner contends that the law prohibits a candidate affiliated with a recognized political party who ran for election in a primary election and lost, from changing his or her voter registration to a minor party organization or becoming an unaffiliated candidate to take advantage of the later filing deadline for nomination-certificate candidates and have his or her name on the subsequent general election ballot.

Conversely, the petitioners contend that the words "who are not already candidates in the primary election" apply only during the pendency of the primary election. Because Mr. Blankenship filed to run as a nomination-certificate candidate *after* he lost the Republican primary election, the petitioners maintain that he is not prevented from utilizing the nomination-certificate process to run in the general election as the Constitution Party candidate. The petitioners assert that Secretary Warner's interpretation of West Virginia Code § 3-5-23(a) is without support from the text of the statute, the explanatory notes, and the title of the bill as introduced and as finally passed. The petitioners contend that the purpose of West Virginia Code § 3-5-23(a) is to prevent "cross filing." Moreover, the petitioners point out that this Court's recent opinion *Wells v. Miller*, 237 W.Va. 731, 791

6

S.E.2d 361 (2016), which discussed the statute at length, did not refer to the statute as a "sore loser law."[4]

In determining the meaning of West Virginia Code § 3-5-23(a), we are mindful that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. Pt. 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975). In addition, this Court has held that

> A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith.

Syl. Pt. 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908). Further, under our law,

> [i]t is the duty of a court to construe a statute according to its true intent, and give to it such construction as will uphold the law and further justice. It is as well the duty of a court to disregard a construction, though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity.

Syl. Pt. 2, *Click v. Click*, 98 W.Va. 419, 127 S.E. 194 (1925). We now proceed to apply these rules to the statutory language at issue.[5]

---

[4]Notably, however, in her dissent in *Wells*, former Justice Davis characterized West Virginia Code § 3-5-23(a) as "prevent[ing] unsuccessful primary election candidates from subsequently running as independent candidates." 237 W.Va. at 749, 791 S.E.2d at 379.

7

First, we find it significant that in 2009, when the Legislature amended West Virginia Code § 3-5-23(a) to add the phrase "who are not already candidates in the primary election," West Virginia Code § 3-5-24(a) (2005) was also amended to extend the deadline for filing a nomination certificate to August 1. In the previous version of the statute, the filing deadline for nomination-certificate candidates was "not later than the day preceding the date on which the primary election is held." W.Va. Code § 3-5-24. Thus, prior to 2009, the results of the primary election were obviously unknown to a third-party candidate who filed for office. Under our prior law, it was impossible for a person who lost in the primary to later file as a nomination-certificate candidate. However, the extension of the deadline for filing a nomination certificate until August 1 created the possibility of a candidate who lost in the primary election to then seek to continue his or her campaign as a nomination-certificate candidate. It is reasonable to conclude that to prevent this scenario, the Legislature simultaneously added the language "who are not already candidates in the primary election" into West Virginia Code § 3-5-23(a).

Second, construing West Virginia Code § 3-5-23(a) to prevent a primary election candidate from filing as a nomination-certificate candidate only during the pendency of the primary election is an unreasonable reading of the statute that would lead

---

[5] In *Wells*, we found the language in West Virginia Code § 3-5-23(a) ambiguous on the issue whether the statute expressly forbade a member of a recognized political party from becoming a nomination-certificate candidate. After utilizing our rules of statutory construction, we held that such a candidate may not become a candidate for political office by virtue of the nomination certificate process outlined in West Virginia Code § 3-5-23. The issue in the instant case is different from the one in *Wells*.

to absurd results. As noted above, the deadline for filing a nomination certificate is August 1, which always falls after the date of the May primary election. Therefore, while a primary election candidate would be prevented from filing a nomination certificate during the pendency of the primary election, he or she could simply wait until the conclusion of the primary election to file his or her nomination certificate. If such were the case, the prohibition in West Virginia Code § 3-5-23(a) could be so easily circumvented as to be meaningless. "It is always presumed that the Legislature will not enact a meaningless or useless statute." *T. Weston, Inc. v. Mineral Cnty.*, 219 W.Va. 564, 568, 638 S.E.2d 167, 171 (2006) (citation omitted)

Therefore, we conclude that the prohibition in West Virginia Code § 3-5-23(a) is not limited to the pendency of the primary election but also includes those candidates who ran in the primary election. Accordingly, we now hold that West Virginia Code § 3-5-23(a) (2018) prevents unsuccessful primary election candidates from subsequently running as nomination-certificate candidates in the general election.[6]

---

[6] The parties also argue about the applicability to this case of West Virginia Code §§ 3-5-23(f) and (g), which became effective on June 5, 2018, and provide:

> (f) For the purposes of this section, any person who, at the time of the filing of the nomination certificate or certificates, is registered and affiliated with a recognized political party as defined in § 3-1-8 of this code may not become a candidate for political office by virtue of the nomination-certificate process as set forth in this section.

> (g) For the purposes of this section, any person who was a candidate for nomination by a recognized political party as

*B. Constitutionality of the Title to H.B. 2981*

The petitioners assert the alternative argument that if West Virginia Code § 3-5-23(a) prevents the loser of a primary from later running as a nomination-certificate candidate, then the statutory language at issue is unconstitutional. Pursuant to Article VI, Section 30 of the West Virginia Constitution, "[n]o act hereafter passed shall embrace more than one object, and that shall be expressed in the title." *Id.* The provision further states that if a bill does not provide a sufficient description of its contents, "the act shall be void only as to so much thereof, as shall not be so expressed." According to the petitioners, the purpose of this provision is to protect both the Legislature and the public from hidden provisions in statutes.

West Virginia Code § 3-5-23(a) was amended in 2009 by H.B. 2981[7] to add the phrase "who are not already candidates in the primary election." The petitioners point

defined in § 3-1-8 of this code may not, after failing to win the nomination of his or her political party, become a candidate for the same political office by virtue of the nomination-certificate process as set forth in this section.

Because we find that section (a) disposes of the issue before us, we do not find it necessary to discuss sections (f) and (g).

[7] The title to H.B. 2981 provides as follows:

AN ACT to amend and reenact § 3-5-7, § 3-5-23 and § 3-5-24 of the Code of West Virginia, 1931, as amended, all relating to elections, generally requiring candidates for the Senate and House of Delegates to file announcement of candidacy with the Secretary of State; reducing number of signatures needed for nomination of third-party candidates; making filing deadline

out that the title to H.B. 2981 contains no reference to this change in West Virginia Code § 3-5-23(a). Thus, the petitioners argue that the title to H.B. 2981 flatly fails to adequately inform that there were changes made to the eligibility requirements for nomination-certificate candidates. The petitioners aver that the title appears to describe all changes made by the Act to West Virginia Code §§ 3-5-7, 3-5-23, and 3-5-24, *except* the added eligibility requirement in § 3-5-23(a) for those seeking certificate nomination.

The general principles set forth in *Wheeling v. Casualty Co.*, 131 W.Va. 584, 48 S.E.2d 404 (1948), govern this case. In *Wheeling*, this Court explained:

> In considering whether an act of the Legislature violates the constitutional requirement concerning its title, the provision of the Constitution must be construed liberally in favor of the act, and generally the language in a title to an act should be construed in the most comprehensive sense favorable to the validity of the act. The provisions of Section 30, Article VI of the Constitution of this State, will be liberally construed to sustain a legislative enactment and all doubt will be resolved in favor of the constitutionality of the statute.
>
> When the principal object of an act is expressed in the title and the act embraces with such principal object other auxiliary objects, the act, if not otherwise objectionable, is valid, not only as to the principal object but also as to the auxiliary objects. If the title to an act is broad enough to give a fair and reasonable index to all the purposes of the act, it is not

> for the nomination of candidates August 1; eliminating requirement that persons signing nomination certificate state a desire to vote for nominated candidate; permitting duly registered voters who sign nomination certificates to vote in the corresponding primary election; establishing the date by which the filing fee must be paid; and making technical corrections.

11

necessary to descend to particulars in the title. If the title to an act is sufficiently clear and full as not to mislead the legislators, it satisfies the requirements of Section 30, Article VI of the Constitution of this State, and that constitutional provision does not require the details of the legislation to be disclosed in the title. The test of the sufficiency of the title to a statute is whether it will impart to a person interested in its subject matter enough information to provoke a reading of the act and to restrict its scope to a single topic.

131 W.Va. at 594-95, 48 S.E.2d at 410 (citations omitted). Accordingly, this Court held in

syllabus three of *Wheeling*:

The title to an act of the Legislature which amends and reenacts a particular section, article and chapter of the Code by specific reference to them, and which relates to an object as to which, and as to the original section of the Code, the provisions of the act are not foreign, but are congruous and germane and such as might have been incorporated in the section when enacted, and which title is broad enough to give a fair and reasonable indication of the purposes, but does not disclose the details, of the act, satisfies the requirements of Section 30, Article VI of the Constitution of this State and is valid.

The petitioners argue that this case is governed by *C.C. "Spike" Copley Garage v. P.S.C. of W.Va.*, 171 W.Va. 489, 300 S.E.2d 485 (1983). *Copley Garage* concerned the Legislature's passage of an omnibus statute that radically altered the authority and operating procedures of the Public Service Commission ("PSC"). Among other things, it had the effect of deregulating the business of towing, hauling or carrying wrecked or disabled vehicles. This Court found that the title of the Act was deficient because while the title was "enormously specific; it set forth a brief description of every

major change that the act made *except* deregulation of wrecker services." 171 W.Va. at 491, 300 S.E.2d at 487. This Court explained:

> The title to Chapter 98 is not infirm because it is vague and unspecific, but rather because it is positively misleading. A person reading a title to a bill drawn with the specificity of the title to Chapter 98 who finds no mention of wrecker services in the title would reasonably conclude that the act did not touch that subject because all the other concerns are set forth with specificity.

*Id.* We held in syllabus point one of *Copley Garage*:

> Where the title to an act of the Legislature is specific about the purpose of all provisions of an omnibus act except one isolated provision, the title is deficient under *W.Va. Const.*, art. VI, § 30 with regard to the provision in the act whose purpose is obscured because the omission of one purpose in a title that is otherwise exhaustively informative is positively misleading.

This Court does not believe that *Copley Garage* applies to the instant facts. As noted in the opinion, *Copley Garage* was a "close case." 171 W.Va. at 490, 300 S.E.2d at 486. Additionally, *Copley Garage* concerned an omnibus statute that radically changed the authority and operating procedures of the PSC. In contrast, the instant case concerns the simple amendment and reenactment of three statutes. For these reasons, we believe *Wheeling* to be the more applicable case.

Construing the language in the title of H.B. 2981 in the most comprehensive sense favorable to the validity of the Act and resolving all doubt in favor of the constitutionality of the statute, we find the language of the title of H.B. 2981 to be

constitutionally sufficient. As noted in *Wheeling*, the test is simply whether someone interested in the bill's subject matter would know to read it. The title need not inform the reader of every specific change, but must alert the reader to the broader topics of the bill and not affirmatively mislead the reader. The title to H.B. 2981 designates the chapter and sections of the Code that are amended. Also, the title alerts the reader that it relates to "elections generally," including the "nomination of third-party candidates," and nomination certificates. Finally, while the title is not extremely detailed, it is not misleading. In sum, we believe that someone interested in third-party candidates and "nomination certificates" would know to read West Virginia Code § 3-5-23(a) as amended by H.B. 2981. Therefore, we hold that the title to H.B. 2981 (2009), an act to amend and reenact West Virginia Code §§ 3-5-7, 3-5-23, and 3-5-24, is constitutionally sufficient under Article VI, Section 30 of the West Virginia Constitution.[8]

---

[8] The petitioners also contend that the title to H.B. 2981 is insufficient because subsection (h) of the amended West Virginia Code § 3-5-23 creates a criminal act subjecting candidates to a criminal penalty of up to one year in jail and a $1,000 fine. The petitioners hinge their argument on *State ex rel. Myers v. Wood*, 154 W.Va. 431, 175 S.E.2d 637 (1970), in which they say this Court struck from the law a provision in a bill creating a new crime because the title of the bill gave no indication that a new criminal offense was established. We note, however, that H.B. 2981 did not create a new crime. Section (f) of W.Va. Code § 3-5-23 (2006), before the 2009 amendment, provided that "any person violating the provisions of this section is guilty of a misdemeanor and, upon conviction, shall be fined not more than one thousand dollars, or confined in jail for not more than one year, or both." The 2009 amended section (f) contained the same crime, as does section (h) in the current version of the statute. Therefore, we find no merit to the petitioners' argument.

*C. Other Constitutional Issues*

1. Freedom of Association

The petitioners next deem § 3-5-23(a) to be unconstitutional because it abridges their freedom of association rights. As provided in Article III, Section 16 of the West Virginia Constitution, "[t]he right of the people to assemble in a peaceable manner, to consult for the common good, to instruct their representatives, or to apply for redress of grievances shall be held inviolate." The petitioners note that decisions of the United States Supreme Court as well as this Court have held that the right to associate with others to advance particular causes is necessarily embedded in the freedoms of speech and of the press. Similarly, say the petitioners, the U.S. Court of Appeals for the Fourth Circuit has observed, "[t]he First Amendment, as incorporated against the states by the Fourteenth Amendment, protects the rights of individuals to associate for the advancement of political beliefs and ideas." *South Carolina Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 755-56 (4th Cir. 2010).

The petitioners further aver that they are severely burdened by the Secretary's application of § 3-5-23(a). They explain that it has caused Mr. Blankenship to lose the momentum that has propelled him, a newcomer to politics, to a respectable third-place finish against two experienced politicians. They conclude that not only will this

arrested momentum deny him a run for the office of United States Senator in 2018, but the

denial could also effect a premature closing of the door to a future run for office.[9]

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504

U.S. 428 (1992), the United States Supreme Court established a balancing test to evaluate

challenges to state ballot access requirements:

> A court considering a challenge to a state election law must
> weigh the character and magnitude of the asserted injury to the
> rights protected by the First and Fourteenth Amendments that
> the plaintiff seeks to vindicate against the precise interests put
> forward by the State as justifications for the burden imposed
> by its rule, taking into consideration the extent to which those
> interests make it necessary to burden the plaintiff's rights.

*Burdick*, 504 U.S. at 434 (citation and internal punctuation omitted). Our Court explained,

> The required analysis depends upon the extent to which a
> challenged regulation burdens First and Fourteenth
> Amendment rights. For severe restrictions, the regulation must
> be narrowly drawn to advance a state interest of compelling
> importance. For reasonable, nondiscriminatory restrictions, the
> State's important regulatory interests are generally sufficient to
> justify the restrictions.
>
> Without question, the impact of candidate eligibility
> requirements on voters implicates basic constitutional rights.
> Nonetheless, not all restrictions imposed by the States on
> candidates' eligibility for the ballot impose constitutionally-
> suspect burdens on voters' rights to associate or to choose
> among candidates. As a practical matter, there must be
> substantial regulation of elections if they are to be fair and
> honest and if some sort of order, rather than chaos, is to
> accompany the democratic processes.

*Wells*, 237 W.Va. at 745, 791 S.E.2d at 375 (quotation marks and citations omitted).

---

[9] According to Intervenor Republican Party, Inc., more than forty states have enacted sore loser laws and every constitutional challenge has failed.

Instructive on the matter of burdens to ballot access is the United States Supreme Court case of *Storer v. Brown*, 415 U.S. 724 (1974). In *Storer*, the Supreme Court upheld a California election statute that denied ballot access to an independent candidate seeking elective office if the candidate had a registered affiliation with a qualified political party within one year prior to the immediately preceding primary election. *Id.* at 736. In finding California's disaffiliation requirement constitutional, the Supreme Court stated as follows:

> The requirement that the independent candidate not have been affiliated with a political party for a year before the primary is expressive of a general state policy aimed at maintaining the integrity of the various routes to the ballot. It involves no discrimination against independents.
>
> The general election ballot is reserved for major struggles; it is not a forum for continuing intraparty feuds. The provision against defeated primary candidates running as independents effectuates this aim, the visible result being to prevent the losers from continuing the struggle and to limit the names on the ballot to those who have won the primaries and those independents who have properly qualified. The people, it is hoped, are presented with understandable choices and the winner in the general election with sufficient support to govern effectively.
>
> [The disaffiliation statute] . . . . protects the direct primary process by refusing to recognize independent candidates who do not make early plans to leave a party and take the alternative course to the ballot. It works against independent candidacies prompted by short-range political goals, pique, or personal quarrel. It is also a substantial barrier to a party fielding an "independent" candidate to capture and bleed off votes in the general election that might well go to another party.

*Storer*, 415 U.S. at 733-35.

*Storer* is often used by courts as a benchmark to measure the burden imposed by an election law. For example, in *Timmons*, 520 U.S. 351, 369, the Supreme Court upheld a Minnesota law that prohibited an individual from appearing on the ballot as the candidate of more than one party. In doing so, the Supreme Court explained:

> Minnesota's fusion ban is far less burdensome than the disaffiliation rule upheld in *Storer*, and is justified by similarly weighty state interests. . . . Under the California disaffiliation statute at issue in *Storer*, *any* person affiliated with a party at any time during the year leading up to the primary election was absolutely precluded from appearing on the ballot as an independent or as the candidate of another party. Minnesota's fusion ban is not nearly so restrictive; the challenged provisions say nothing about the previous party affiliation of would-be candidates but only require that, in order to appear on the ballot, a candidate not be the nominee of more than one party. California's disaffiliation rule limited the field of candidates by thousands; Minnesota's precludes only a handful who freely chose to be so limited. It is also worth noting that while California's disaffiliation statute absolutely banned many candidacies, Minnesota's fusion ban only prohibits a candidate from being named twice.

> We conclude that the burdens Minnesota's fusion ban imposes on the New Party's associational rights are justified by "correspondingly weighty" valid state interests in ballot integrity and political stability.

520 U.S. at 369-370 (footnote omitted). *See also Burdick*, 504 U.S. at 437 (comparing Hawaii's prohibition on write-in candidacies to the law upheld in *Storer*); *Backus v. Spears*, 677 F.2d 397, 400 (4th Cir. 1982) (comparing South Carolina's sore-loser law to the law upheld in *Storer*).

18

In the instant case, the language in West Virginia Code § 3-5-23(a) barring sore loser candidacies is far less burdensome than the law in *Storer,* and only slightly burdensome to those candidates' ability to run for office. Mr. Blankenship was not prevented from running on the primary election ballot for the United States Senate, and if he had won the primary, he would be on the general election ballot as the nominee of the Republican Party. Also, the statute does not absolutely prohibit Mr. Blankenship from appearing on the general election ballot as an independent or nominee of an unrecognized party; Mr. Blankenship is only barred because he voluntarily chose to compete in the primary election as a Republican. The only burden imposed on candidates like Mr. Blankenship is that they must choose between the two paths for a spot on the general election ballot: the path for recognized parties or the one for independents and unrecognized parties. *See De La Fuente v. Merrill*, 214 F. Supp. 3d 1241, 1256 (M.D.Ala. 2016) (stating that "[i]t cannot be over-emphasized that Mr. De La Fuente is only barred from the ballot because of his voluntary participation in the Democratic Primary."). Moreover, even after losing the Republican primary, Mr. Blankenship had until September 18 to register as an official write-in candidate.

The language in § 3-5-23(a) is also minimally burdensome on unrecognized political parties like the Constitution Party. The Supreme Court has recognized "[t]hat a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights." *Timmons*, 520 U.S. at 359 (citations

omitted). A limitation like a sore loser law does not "restrict the ability of the [unrecognized party] and its members to endorse, support, or vote for anyone they like." *Id.* at 363. Sore loser laws do not "directly limit [an unrecognized] party's access to the ballot . . . [but merely] reduce the universe of potential candidates who may appear on the ballot as the party's nominee." *Id.* Further, the unrecognized party is "free to try to convince" its desired candidate "to refrain from seeking the nomination of another political party." *South Carolina Green Party*, 612 F.3d at 757 (citation omitted). Moreover, "the burdens [a]re not severe because [the unrecognized party] and its members remain[] free to govern themselves internally and to communicate with the public as they wish." *Clingman v. Beaver*, 544 U.S. 581, 589 (2005). These unrecognized parties "simply c[an]not nominate as their candidate any of [a] few individuals, *id.* at 590 (internal quotations omitted), on account of voluntary choices made by those individuals alone." That is quite different from a law that "directly hampers the ability of a party to spread its message." *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 233 (1989). Accordingly, we conclude that language in West Virginia Code § 3-5-23(a) does not place a severe burden on the petitioners.

The United States Supreme Court case of *Jenness v. Fortson*, 403 U.S. 431 (1971), provides additional guidance on the issue of freedom of association. In *Jenness*, the Supreme Court was called upon to examine the basic structure of pertinent provisions of the Georgia Election Code, which provided as follows:

> Any political organization whose candidate received 20% or more of the vote at the most recent gubernatorial or presidential election is a "political party." Any other political organization is a "political body." "Political parties" conduct primary elections, regulated in detail by state law, and only the name of the candidate for each office who wins this primary election is printed on the ballot at the subsequent general election, as his party's nominee for the office in question. A nominee of a "political body" or an independent candidate, on the other hand, may have his name printed on the ballot at the general election by filing a nominating petition. This petition must be signed by "a number of electors of not less than five per cent. of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking . . . ."

403 U.S. at 433 (footnotes omitted). Those challenging the Georgia law launched a two-pronged attack. First, they said that requiring a nonparty candidate to acquire the signatures of a certain number of voters before his or her name is printed on the ballot is to abridge the freedoms of speech and association guaranteed by the First and Fourteenth Amendments. Regarding the challenge based on the freedom of association, the Court in *Jenness* reasoned as follows:

> Anyone who wishes, and who is otherwise eligible, may be an independent candidate for any office in Georgia. Any political organization, however new or however small, is free to endorse any otherwise eligible person as its candidate for whatever elective public office it chooses. So far as the Georgia election laws are concerned, independent candidates and members of small or newly formed political organizations are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. They may confine themselves to an appeal for write-in votes. Or they may seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question. . . .
>
> In a word, Georgia in no way freezes the status quo, but implicitly recognizes the potential fluidity of American

21

> political life. . . . We can find in this system nothing that abridges the rights of free speech and association secured by the First and Fourteenth Amendments.

403 U.S. at 438-440.

Similarly, language in West Virginia Code § 3-5-23(a) does not violate the freedom of association rights of Mr. Blankenship and the members of the Constitution Party. Anyone who wishes and is eligible may be a nomination-certificate candidate for office in West Virginia. Had Mr. Blankenship not run for the United States Senate in the Republican Primary, he presumably would have been eligible to run as the Constitution Party's nominee for the United States Senate. The Constitution Party was free to endorse and nominate any otherwise eligible person for its nominee. The petitioners remain "free to associate, to proselytize, to speak, to write, and to organize campaigns" for the propagation of their political beliefs. *See Jenness*, 403 U.S. at 438. Significantly, Mr. Blankenship still had the opportunity to file as a write-in candidate.

## 2. Equal Protection

The petitioners next assert that if the the language in West Virginia Code § 3-5-23(a) constitutes a sore loser law, it would violate the constitutional equal protection guarantee because the petitioners are similarly situated to other parties and candidates, but West Virginia law treats them disparately. This Court has held that "[e]qual protection of the law is implicated when a classification treats similarly situated persons in a disadvantageous manner." Syl. Pt. 2, in part, *Israel v. W.Va. Secondary Sch. Activities*

22

*Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989). We have explained that "West Virginia's constitutional equal protection principle is a part of the Due Process Clause found in Article III, Section 10 of the West Virginia Constitution." Syl. Pt. 4, *Israel, supra.* The petitioners base their claim on the fact that the use of the nomination-certificate process is denied to any person who previously lost his or her bid to be a recognized party's nominee, while the two smaller recognized parties, the Libertarian and Mountain Party, can circumvent the section (a) by choosing a losing primary candidate by a nominating convention. Thus, explain the petitioners, section (a) operates to deny the Constitution Party of the right to nominate a candidate for an office when the candidate lost another party's nomination, but allows the Libertarian and Mountain Parties, as well as the Democrat and Republican Parties, to do just that. Therefore, the petitioners contend, section (a) treats similarly-situated persons in a disadvantageous manner. Moreover, the petitioners assert that for the same reasons the section (a) language denies to Mr. Blankenship his fundamental right of access to the ballot because the right to access in West Virginia is a fundamental right under the Equal Protection Clause.

The Supreme Court in *Jenness* also addressed an equal protection challenge raised against the Georgia election law at issue. First, the *Jenness* Court compared the facts of that case with the facts of *Williams v. Rhodes*, 393 U.S. 23 (1968), a case in which the Supreme Court found invidious discrimination in Ohio's election laws. The Court determined that Georgia's election laws were not unconstitutional. The Court explained:

Unlike Ohio, Georgia freely provides for write-in votes. Unlike Ohio, Georgia does not require every candidate to be the nominee of a political party, but fully recognizes independent candidacies. Unlike Ohio, Georgia does not fix an unreasonably early filing deadline for candidates not endorsed by established parties. Unlike Ohio, Georgia does not impose upon a small party or a new party the Procrustean requirement of establishing primary election machinery. Finally, and in sum, Georgia's election laws, unlike Ohio's, do not operate to freeze the political status quo.

*Id.* at 438. The *Jenness* Court further indicated:

The fact is, of course, that from the point of view of one who aspires to elective office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization. We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. Georgia has not been guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot. Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in *Williams v. Rhodes, supra.*

*Id.* at 440-442 (footnotes omitted).

Based on the Supreme Court's decisions in *Jenness*, *Storer*, *Timmons*, and the other cases discussed above, we find no invidious discrimination in the fact that, under our election laws, the use of the certificate nomination process is denied to any person who

previously lost his or her bid to be a recognized party's nominee, while the two smaller yet statutorily recognized parties, the Libertarian and the Mountain Party, can circumvent the section (a) prohibition by choosing a losing primary candidate in a nominating convention. As the Supreme Court noted in *Jenness*, the fact is that there are obvious differences in kind between the needs and potentials of political parties, such as the Mountain and Libertarian Parties which have historically earned a certain level of support, and a new or small political organization such as the Constitution Party. A state is not guilty of invidious discrimination in recognizing these differences and in providing different treatment in its election laws.

Significantly, the petitioners simply are not similarly situated to recognized parties. Smaller recognized parties have polled at least one percent in the previous gubernatorial election. *See* W.Va. Code § 3-1-8 (stating that an officially recognized political party is established when an affiliation of voters polled at least one percent in the previous gubernatorial election). This difference is crucial, as West Virginia law affords parties that have polled at a certain rate "political party" status and, with that status, the ability to nominate candidates in a primary election or convention. *See* W.Va. Code § 3-1-8 (stating that an officially recognized political party is established when an affiliation of voters polled at least one percent in the previous gubernatorial election); W.Va. Code § 3-5-4 (allowing recognized political parties to use the primary process to nominate candidates); W.Va. Code § 3-5-22 (allowing recognized political parties who polled less

than ten percent in the prior gubernatorial election to use the convention process to nominate candidates).

Notably, recognized parties do not carry the same risks to the electoral system posed by independent candidates and unrecognized parties. Recognized parties have a demonstrated history of political performance. Therefore, it is unlikely that a recognized party will nominate another recognized party's losing candidate and create a splinter faction comprised primarily of the loser's original party because an existing recognized party has an established party base. Further, recognized parties have internal checks, systems, and nominating procedures that govern whether they ultimately decide to nominate the other recognized party's losing candidate.

Significantly, recognized parties have internal systems, and nominating procedures that govern their choice of nominee. In contrast, the nomination-certificate process has no such system of checks to preclude a jilted candidate from running and even forming his or her own party out of spite. The nomination-certificate candidate must simply gather signatures. He or she has no party procedures to negotiate, no party members to win over, and no votes to win at a convention. Additionally, a primary loser's access to the nomination-certificate process poses a risk to the stability of the political system. Specifically, the primary loser is likely to siphon votes from the party of which he or she was a primary candidate. For example, parties opposing the Republican Party in the general election may attempt to elevate a candidate through the nomination-certificate process in

an effort to split the Republican vote between the primary winner and the nomination-certificate candidate in the general election to make it more likely that the other party's candidate will win the general election. Therefore, we find that the difference in treatment in West Virginia Code § 3-5-23(a) between recognized parties, on one hand, and unrecognized parties and independent candidates on the other, does not constitute invidious discrimination.

As set forth above, the language at issue in section (a) regarding "who are not already candidates in the primary election" imposes only a minimal burden and is nondiscriminatory. As this Court stated in *Wells*, "[f]or reasonable, nondiscriminatory restrictions, the State's important regulatory interests are generally sufficient to justify the restrictions." 237 W.Va. at 745, 791 S.E.2d at 365 (internal quotation marks and citations omitted). In syllabus point four of *State ex rel. Sowards*, 196 W.Va. 739, 474 S.E.2d 919, we held:

> The State of West Virginia through its Legislature retains the authority to prescribe reasonable rules for the conduct of elections, reasonable procedures by which candidates may qualify to run for office, and the manner in which they will be elected.

Several important regulatory interests are served by the prohibition in West Virginia Code § 3-5-23(a). [10]

---

[10]The petitioners' argument on the different treatment between the recognized and unrecognized parties is essentially a claim that the § 3-5-23(a) clause is under-inclusive, i.e., it denies the Constitution Party the right of nominating a candidate for office when the candidate lost another party's nomination, but allows the Libertarian and Mountain Parties,

First, courts have found that states have an interest specifically in preventing sore loser candidacies. *See Burdick*, 504 U.S. at 439 (upholding Hawaii's ban on write-in voting as "a legitimate means of averting divisive sore-loser candidacies"); *Clingman*, 544 U.S. at 594 (upholding Oklahoma's semi-closed primary because it advanced the state's regulatory interest in "guard[ing] against party raiding and sore loser candidacies by spurned primary contenders." (citation omitted)). Second, a sore loser law advances the state's legitimate interest in regulating the number of candidates on the ballot. *See Anderson*, 460 U.S. at 788 n. 9 (remarking that "it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." (citation omitted)); *Storer*, 415 U.S. at 732 (providing that states have "an interest, if not a duty, to protect the integrity of its political processes from frivolous and fraudulent candidacies." (citation omitted)); *Timmons*, 520 U.S. at 364 (recognizing the state's interest in "avoiding voter confusion and overcrowded ballots." (citation omitted)). Third, a prohibition on sore loser candidacies serves the state's interest in preserving identifiable political parties. *See Clingman*, 544 U.S. at 594 (recognizing the important regulatory interest in "preserv[ing]

---

as well and the Republican and Democrat Parties, to do just that. However, because the section (a) clause does not impose a severe burden and is not discriminatory, "the State need not narrowly tailor the means it chooses to promote" its interests. *Timmons*, 520 U.S. at 365. Instead, "[w]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' . . . 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). As noted above, because we find the section (a) provision to be reasonable and nondiscriminatory, the State need not narrowly tailor the means by which it chooses to promote its interests.

the political parties as viable and identifiable interest groups."); *Timmons*, 520 U.S. at 366 (indicating that "[t]he State surely has a valid interest in making sure that minor and third parties who are granted access to the ballot are bona fide and actually supported, on their own merits."); *Storer*, 415 U.S. at 735 (recognizing the interest in preventing those who lost their party primary from retaining their candidacy to "continu[e] intraparty feuds."). Fourth, a sore loser law is justified by the state's interest in orderly, fair, and efficient procedures for elections. *See Timmons*, 520 U.S. at 364 (providing that "[s]tates certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." (citation omitted)). Finally, a sore loser law furthers a state's "strong interest in the stability of [its] political system." *Timmons*, 520 U.S. at 366 (citation omitted). *See also Storer*, 415 U.S. at 736 (indicating that it has been a concern since the Founding Era "that splintered parties and unrestrained factionalism may do significant damage to the fabric of the government."); *Storer*, 415 U.S. at 735 (a sore loser law "works against independent candidacies prompted by short-range political goals, pique, or personal quarrel."). Therefore, this Court finds that the prohibition in West Virginia Code § 3-5-23(a) is a reasonable, nondiscriminatory restriction, and that the State's important regulatory interests are sufficient to justify the restriction. Accordingly, we now hold that West Virginia Code § 3-5-23(a), which prevents unsuccessful primary election candidates from subsequently running as nomination-certification candidates does not violate the constitutional guarantees of free association and equal protection.

In sum, this Court finds first that West Virginia Code § 3-5-23(a) prohibits unsuccessful primary candidates from running as nomination-certificate candidates in the general election. Second, we find the title of H.B. 2981 to be constitutionally sufficient. Third, we find the language at issue in West Virginia Code § 3-5-23(a) does not violate the constitutional guarantees of freedom of association and equal protection. Finally, we find the ballot access restriction in West Virginia Code § 3-5-23(a) to be reasonable and nondiscriminatory, and that the State's important regulatory interests are sufficient to justify the restriction. Therefore, because Mr. Blankenship unsuccessfully ran in the 2018 Republican primary election, he is now prohibited from gaining access to the 2018 general election ballot for the same office by means of a nomination-certificate candidacy.

## IV.  CONCLUSION

Based upon the foregoing, we find that there is no clear legal right in the petitioners to the relief sought, and there is no legal duty on the part of the respondent to do the thing which the petitioners seek to compel. Accordingly, we deny the writ sought by the petitioners.

Writ denied.